# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

Zoya Code,

                              Plaintiff,

v.


Derek Chauvin, acting in his individual
capacity as a Minneapolis Police Officer;
Ross Blair, acting in his individual capacity
as a Minneapolis Police Officer; and the City
of Minneapolis,

                              Defendants.

_____

**COMPLAINT**
**Jury Trial Demanded**
**Under FRCP 38(b)**

For her Complaint, Plaintiff Zoya Code ("Zoya") states and alleges as follows:

## INTRODUCTION

1.      This is an action for money damages for injuries sustained by Zoya as a result of the gratuitous use of excessive force by then-Minneapolis Police Department (MPD) officer Derek Chauvin on June 25, 2017.

2.      Defendant Chauvin was a long-troubled officer with a documented pattern of misconduct.  He actively sought to prey on compliant, vulnerable Black arrestees, including Zoya, John Pope, and George Floyd, among others.  But consistent with its custom and practice of tolerating (if not encouraging or ratifying) misconduct by its officers, MPD allowed Defendant Chauvin's outrageous conduct to continue unabated.  Zoya was one of many unfortunate victims of Defendant Chauvin's racist policing and unchecked use of excessive force.

92775553.1

3.      Moreover, per MPD's longstanding customs and practices, Defendant Ross Blair, another officer at the scene of Defendant Chauvin's use of excessive force against Zoya, participated in the punitive use of force against her and failed to intervene to stop Defendant Chauvin.

4.      Making matters worse, an MPD Sergeant, Tammy Werner, later reviewed and *approved* Defendant Chauvin's unlawful use of force against Zoya.

5.      The City of Minneapolis's longstanding custom and practice of unchecked Fourth Amendment violations committed by MPD officers against its citizenry, and its tolerance and ratification of widespread racist policing by its officers, were moving forces behind the violation of Zoya's constitutional rights.

6.      Defendant Chauvin's repeated use of excessive force culminated in his May 25, 2020 murder of George Floyd outside the Cup Foods store in Minneapolis, slowly asphyxiating the handcuffed, face-down, non-resistant Floyd by pressing his knee into the back of Floyd's neck for more than eight minutes, with the assistance and protection of three other MPD officers.  This kneeing maneuver was Defendant Chauvin's calling card, having used it against Zoya, John Pope, George Floyd, and likely many others.

7.      The City knew its officers, including Chauvin, were applying force to the backs and necks of prone (lying on their stomach) arrestees, despite the known, appreciated, and obvious risk of causing serious injury or death from positional asphyxia. Indeed, the City contracted for and kept a library of digital evidence on its cloud-storage site for body-worn camera (BWC) recordings, known as Evidence.com.  But the City buried its head in the sand regarding such evidence or even worse, reviewed it and did

2

nothing, in either case continuing to condone such actions by officers. More gallingly, the City even *continued to train officers to use such neck restraints*.

8.      Consistent with that training, Defendant Chauvin snuffed the very life out of George Floyd.

9.      Mr. Floyd's murder was witnessed and filmed by a brave and broad group of citizens, including at least one minor, who protested Defendant Chauvin's and his "cover" officers' actions. Subsequent broadcasts of their recordings, and the officers' own BWC recordings from Evidence.com, finally led to accountability for Defendant Chauvin, who was eventually fired and convicted of murder, as well as criminally violating Floyd's and John Pope's federal civil rights.

10.      Like most aspects of the illegal policing practices in which the MPD has engaged for decades, the City's preference even after the murder of Mr. Floyd would have been to stick with business as usual. It took the courage of civilians, and later jurors, to stop Defendant Chauvin.

11.      But while still employed by the City of Minneapolis and MPD, Defendant Chauvin was a serial predator who was never stopped by the City—a walking *Monell* violation—and who fully embraced the City's training on dangerous restraint techniques. Zoya – like Pope, Floyd, and others – suffered the consequences.

## THE PARTIES

12.      Zoya is, and was at all times material herein, a citizen of the United States and a resident of the State of Minnesota. Zoya is Black and has at times struggled with her mental health as an adult.

3

92775553.1

13.     Zoya asserts Fourth and Fourteenth Amendment claims under 42 U.S.C. §§ 1983 and 1988 against Defendants Chauvin and Blair in their individual capacities, for misconduct occurring under color of state law.

14.     Defendant Chauvin was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

15.     Defendant Blair was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

16.     Zoya further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and Title VI of the Civil Right Act of 1964, 42 U.S.C. § 2000d *et seq*.

17.     The MPD is not a separately suable entity but rather is an arm of the City. The City is a municipality duly incorporated under the laws of the State of Minnesota.

18.     Zoya's causes of action arise purely out of federal law.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

19.     Original jurisdiction over this matter exists pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

20.     The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

92775553.1

**THE CITY ENCOURAGES AND ENABLES RACIST, PREDATORY POLICE OFFICERS AND UNCONSTITUTIONAL FORCE PRACTICES**

21.     The City fulfills its policing functions through the MPD, which has a long history of looking the other way when its officers engage in misconduct.

22.     Indeed, MPD's history of using excessive force dates back to at least the 1980s.  From 1983 to 1987, 227 complaints of excessive force were filed against MPD officers, and yet none was upheld by the City.[1]

23.     The misconduct continued over the ensuing years.  By summer 1994, a federal jury concluded that the City maintained a custom of deliberate indifference to complaints about excessive force within MPD.  Even this did not spur change at the police department.

24.     The widespread misconduct by MPD officers persisted into the 21st century.  Data published in the Minneapolis *Star Tribune* on August 17, 2013, revealed that MPD officers were then defendants in 61 lawsuits.[2]

25.     One of those lawsuits was commenced by Darryl Gill, a Black man who had a dreadlock ripped out by MPD officer Sundiata Bronson, who then broke Gill's wrist while he was handcuffed.  Both actions by Bronson constituted excessive force.

26.     Notably, Bronson did so less than a year after he used excessive force on Melvin Dickerson, another Black man.  Bronson slammed Dickerson's face into a plate-glass window, causing injuries including 22 sutures.

---

[1] https://www.thenation.com/article/society/minneapolis-police-brutality-racism/
[2] https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/?refresh=true

27.     But MPD took no action, and Bronson kept trampling citizens' civil rights. In 2012, Bronson assaulted Zachary King, who also is Black, for lawfully carrying a firearm with a permit, landing King in the hospital.  The City settled King's subsequent civil-rights lawsuit for $122,000.[3]

28.     By the time Bronson finally retired in 2014, there had been at least thirteen citizen complaints lodged against him – and yet the only discipline imposed upon him was for improperly operating his squad car in one instance.  All told, the City paid out more than a half million dollars to settle six lawsuits in which Bronson was accused of misconduct.[4]

29.     Bronson is far from the only MPD officer mollycoddled by the City despite clear use of improper and excessive force and predatory, racist conduct.

30.     In August 2009, for instance, MPD officer Joel Pucely threw to the ground and punched Ira Stafford during a traffic stop in which Stafford was not resisting.  The stop culminated with an officer pressing a knee into Stafford's back while he was on the ground in the prone position.  The City settled Stafford's subsequent lawsuit.

31.     Pucely, who remains an MPD officer today, has had at least nine citizen complaints lodged against him; none were sustained by the City.

32.     Another lawsuit alleged that in October 2014, two MPD officers – including Tou Thao, one of the officers involved in George Floyd's murder – punched,

---

[3] https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/
1626645114/Sundiata_Bronson.pdf?1626645114
[4] *Id.*

kicked, and kneed Lamar Ferguson, who is Black, after he had been handcuffed.  The City settled Ferguson's subsequent lawsuit, too.

33.     Like Bronson and Pucely, numerous complaints had been lodged against Thao, with none sustained and no discipline imposed.

34.     These are just mere examples of many.  In total, the City has paid out over $70,000,000 in the last two decades alone as a result of the unconstitutional use of force by MPD officers.

35.     Rather than deal with the problem, the City – through a variety of bodies including the City Council, the Mayor, the City Attorney's Office, and a number of faux police "oversight" boards – enables MPD to the detriment of its citizens, who are the subjects of unconstitutional force practices, and its taxpayers foot the bill.

36.     The longstanding culture of the MPD instills knowledge among the rank-and-file that they can make unconstitutional force decisions with impunity.  The *Star Tribune* reported that the City's "12 costliest settlements from 2006 to 2012 resulted in no officer discipline."[5]

37.     This "business as usual" would have continued with regard to Defendant Chauvin even after he murdered George Floyd, but for civilians who witnessed and filmed the events culminating in his death.

---

[5] https://www.startribune.com/minneapolis-police-face-lawsuits-alleging-misconduct/219998711/

38.     MPD's policies, practices and customs, along with its longstanding failure to discipline offending officers, have led to a pattern and practice of excessive force by MPD officers.

39.     MPD's history of misconduct has been so pervasive, in fact, that it has led to investigations into the department's policing practices by both the United States Department of Justice and the Minnesota Department of Human Rights (DHR).

40.     On April 27, 2022, the DHR published a 72-page report detailing its findings after a nearly two-year investigation into MPD's policing practices.[6]

41.     That investigation included reviewing over 700 hours of BWC footage from MPD officers and nearly 480,000 pages of documents; observing 87 hours of MPD Academy trainings for newly hired police officers; participating in multiple "ride-alongs" with MPD officers in each of MPD's five precincts; analyzing a decade of MPD data regarding officers' uses of force and nearly 3-1/2 years' worth of data on MPD traffic stops and prosecutions; and reviewing use-of-force files and police-misconduct complaints and investigations.

42.     The DHR also interviewed, *inter alia*, current and former MPD officers (from the rank of Chief down to the rank of patrol officer) and staff members, City staff involved with public safety, prosecutors from the City Attorney's and Hennepin County Attorney's Offices, other public-safety employees such as firefighters, health-care

---

[6] A true and correct copy of the DHR's April 27, 2022 report is attached as Exhibit A.

professionals and attorneys in the Twin Cities area, and more than 2,200 community members.

43.     After completing this "comprehensive investigation," the DHR concluded that excessive force and lack of accountability are institutional norms at the MPD and have been for years.

44.     One of the key problems, the DHR reported, is that MPD officers and supervisors receive improper training "which emphasizes a paramilitary approach to policing that results in officers unnecessarily escalating encounters or using inappropriate levels of force."

45.     Indeed, the DHR found that as a result of MPD emphasizing aggression during training, officers repeatedly "us[e] inappropriate levels of force with community members" and "resort to higher levels of physical force . . . even when the individual does not pose an imminent threat to officers or others."

46.     MPD also "reinforces a culture of unquestionable compliance" amongst its officers, and its training "establish[es] a warrior mindset with officers from their very first day as new MPD officer hires."

47.     Such "unquestionable compliance" is antithetical to the Constitution of the United States and MPD's own policies, including an officer's "duty to intervene or duty to report unauthorized use of force," as the DHR noted.

48.     Each of these – the inappropriate use of force, the failure to intervene to stop that force, and the failure to properly report unauthorized force – happened with respect to the incident with Zoya on June 25, 2017.

9

49.     Furthermore, these problems are baked into MPD's field-training program, in which rookie officers are paired with veteran officers for on-the-ground training.  Field trainers "have a lasting impact on rookie officers," yet these veteran officers receive no real instruction on how to mentor and train young officers, or more importantly, how not to.

50.     Making matters worse, MPD routinely allows veteran officers to serve as field trainers despite reports or findings of misconduct against them.  As the DHR noted, "[i]f a field training officer uses unauthorized force or otherwise exhibits police misconduct while they are training a rookie officer, then they are training that rookie officer that using unauthorized force is, in fact, acceptable and even expected."  This is an especially serious problem in an environment in which new officers are expected to demonstrate "unquestioned compliance" with senior officers, particularly because field-training officers "play a significant role in determining whether a rookie officer ultimately passes their probationary period."

51.     The DHR report also found fault with MPD's "accountability systems," noting that they are "insufficient and ineffective at holding officers accountable for misconduct."  MPD's Internal Affairs Unit and the Office of Police Conduct Review are simply toothless tigers that failed to provide any "meaningful independent review" of challenged conduct, particularly because "MPD officers and/or supervisors are embedded in the review process."

92775553.1

52.     For example, uses of force are initially reviewed by shift supervisors, typically Sergeants.  Yet, those supervisors themselves often have been accused of or engaged in misconduct, including the use of excessive force.

53.     In other words, at MPD the foxes guard the hen house.

54.     Most often, especially when criminal or civil liability or discipline is a likelihood, the so-called "review" of alleged misconduct is farcical.  Despite having at their disposal critical pieces of objective evidence – most notably BWC videos of officers at the scene, but also (among other things) MPD training materials, third-party videos, and weapon-system-manufacturer recommendations and warnings – the "investigators" ignore that objective evidence because the "review" actually is designed to avoid accountability rather than identifying and addressing misconduct.  These "investigations" are intentionally skewed so that they amount to no real investigation at all, ending with a pre-ordained result in which either no discipline or impotent "counseling" is imposed, doing nothing to effect change.

55.     In short, instances of misconduct, according to the DHR report, are "not properly investigated, not timely addressed, and officers are not consistently held accountable," even when BWC evidence or other objective evidence contradicts an officer's use-of-force reporting.

56.     This explains why Defendant Chauvin was so nonchalant when he murdered George Floyd on film and violated the civil rights of Zoya, John Pope, and others while being filmed by MPD's own BWC equipment.

11

57.     By ignoring BWC videos and otherwise, MPD supervisors simply do not "adequately review[] and assess[] inaccuracies or false statements made by officers in their use of force reports."

58.     This, too, was true of MPD Sergeant Werner's "review" of the use of force against Zoya on June 25, 2017.

59.     Without a fair, objective, "non-biased" and consistently applied system of oversight in place, nothing will change.  City and MPD leaders have known this for years but have refused to do anything about it.

60.     Yet, a hyper-aggressive, paramilitary culture resulting in the repeated use of unlawful and excessive force by police officers, and the lack of effective accountability systems, are not the only problems plaguing the MPD.

61.     MPD also suffers from a serious racism problem.

62.     The problem is so ingrained and so pervasive, in fact, that the DHR found probable cause to conclude that MPD "engage[s] in a pattern or practice of race discrimination."

63.     For example, in its findings the DHR determined that MPD "maintains an organizational culture where officers consistently use racist . . . language" but did not "uniformly and consistently hold officers accountable" therefor.

64.     Indeed, over the 11-year period between January 2010 and April 2021, "MPD rarely disciplined officers" for using racist language.

65.     The DHR's report noted that MPD officers and supervisors used racial slurs, including calling Black persons "niggers," "monkeys," "orangutans," and "Black

12

bitches."  Black MPD officers were no exception – the DHR found that officers referred to their Black colleagues as "nappy head" and "cattle."

66.     Far worse, the DHR found that Black members of the community were more likely to be targeted for law-enforcement action by MPD officers.

67.     It noted that MPD officers were more likely to stop vehicles occupied by people of color, more likely to search those vehicles, and more likely to use force against and arrest those vehicle occupants.

68.     Simply put, the DHR found significant statistical differences in the way Black individuals and white individuals are treated in similar circumstances.

69.     The ingrained racist culture at the MPD, along with its training emphasizing aggressive, militaristic tactics and the lack of effective accountability processes, combine to provide a perfectly toxic environment for officers to violate the Constitution and mete out excessive force against persons of color with impunity and without fear of repercussion or negative consequences.

70.     The DHR's investigation bears that out.  Among other things, the DHR concluded that MPD officers "use higher rates of more severe force against Black individuals than white individuals in similar circumstances" and that "race is the likely reason."

71.     This racist, paramilitary culture was a direct cause of the Defendant Chauvin's inhumane treatment of Zoya on June 25, 2017, and Defendant Blair's failure to take any steps to stop it.

92775553.1

72.     Persons at the highest levels of City government and the MPD, including several Chiefs of Police, have long been aware of the widespread, unlawful use of force by MPD officers and have repeatedly failed to address it.  They have been complicit in the lack of accountability.

73.     Indeed, the DHR found that MPD's Chiefs have been reluctant over the years to impose discipline, allowing investigations to sit on their desks without final review or a disciplinary decision for an average of nearly 15 months.

74.     Likewise, every monetary settlement of a lawsuit against the MPD requires approval—read, knowledge—by the Mayor and the Minneapolis City Council.  But nothing has been done.

75.     As with excessive force and lack of accountability, the racist culture at MPD also did not go unnoticed at the highest levels of City government or by MPD commanders.

76.     As the DHR reported, "City and MPD leaders have been aware of deep organizational culture problems within the MPD resulting in the long-standing, disproportionate impact of race based policing on people of color."

77.     Indeed, "[f]ormer and current Mayors, City officials, Police Chiefs, and high-level MPD officials *acknowledge* that there is a problem with MPD's organizational culture that results in racial disparities."

78.     Despite their knowledge, City and MPD leaders let the problems spread for years.

92775553.1

79.     The "lack of collective and sustained action among City and MPD leaders," the report noted, "has, in effect, allowed this organizational culture to fester within MPD and resulted in unlawful policing practices that undermine public safety."

80.     And as a result of the absence of any "coordinated and sustained action to address racial disparities in policing, leaders have allowed MPD to maintain an organizational culture that . . . is averse to accountability."

81.     There has been zero accountability by the City or MPD for the Defendant officers' misconduct involving Zoya on June 25, 2017.  Quite the contrary, supervisor MPD Sergeant Werner actually *approved* that conduct.

82.     Even in the face of the DHR's comprehensive report, some City and MPD leaders still reflexively bristle at the notion that there are widespread problems with the City's police force.  For example, the DHR noted that when confronted with evidence of systemic racism, "some City and MPD leaders, as well as some MPD officers, claim that disproportionality in policing in Minneapolis is due to factors other than race."

83.     Minneapolis Mayor Jacob Frey called the DHR's findings "repugnant, at times horrific" and claimed he was "outraged."  This is but another example of a City leader talking loudly while saying nothing.

84.     Likewise, the *Star Tribune* reported on May 20, 2022, that City leaders had stopped discussions with the DHR on efforts to reform the MPD because they refused to accept some of the DHR's findings without documentary evidence of the same.[7]

---

[7] https://www.startribune.com/minneapolis-halts-police-reform-talks-state-human-rights-officials-lack-evidence-social-media-spying/600175169/?refresh=true

92775553.1

85.     The City Attorney's Office claimed it had demanded such evidence from the DHR but that the DHR "repeatedly refused to share this vital information."

86.     This is a particularly ironic assertion, given that the City Attorney's Office routinely shields BWC evidence from persons subjected to excessive force by MPD officers, under the guise of pretended confidentiality concerns under the Minnesota Government Data Practices Act.

87.     The less comes to light, the better, as far as the City and MPD are concerned.

88.     The DHR's also report highlighted other systemic issues at MPD that impacted Zoya.

89.     One particular method of unconstitutional, discriminatory force emphasized by the DHR in its report concerned neck restraints.

90.     The DHR noted that MPD officers were almost *twice as likely* to use neck restraints against Black individuals than white individuals when confronted with similar situations.

91.     Notably, the City has been aware for years that MPD officers were restraining subjects – especially Black subjects – in ways that were likely to cause death or serious bodily injury.

92.     On September 9, 2010, white MPD officers Timothy Gorman and Timothy Callahan responded to the Minneapolis YMCA, where David Smith, a Black man, was in the midst of a mental-health crisis.

93.     The encounter ended with Smith handcuffed behind his back in the prone position.

94.     Despite being handcuffed and controlled, Smith was held in the prone position by Callahan and Gorman for at least 4-1/2 minutes, with Gorman kneeing on Smith's back and Callahan straddling his thigh/buttocks region.

95.     Smith had no pulse and showed no signs of life by the time Callahan and Gorman finally made any effort to observe his medical condition.

96.     Hennepin County Chief Medical Examiner Andrew Baker determined that Smith's death was a homicide, and that the cause of death was anoxic encephalopathy due to or as a consequence of cardiopulmonary arrest caused by mechanical asphyxia.

97.     Every then-employed MPD officer (including Defendant Chauvin) knew about the Smith incident.

98.     The Smith incident was a clear example of excessive force against a Black man—Gorman kneed on Smith's back while Smith was handcuffed and fully controlled. No reasonable officer could believe that the use of such force was objectively reasonable.

99.     Yet, the MPD took no disciplinary action against Callahan or Gorman and, instead, deemed their actions consistent with policy and training.  MPD Spokesman John Elder said the following regarding the Smith incident:  "As tragic as the incident was, the officers tried their best, and if mistakes were made they were done so under the standard law enforcement practices and training at the time."

100.    Elder's ridiculous statement is but one example of MPD's ratification of patently unreasonable force decisions by its officers.

17

101.    The City paid $3,000,000 to settle the Smith family's lawsuit.  But rather than deal with the core problem of unchecked and undisciplined use of excessive force by its officers, particularly against Black persons, the City's taxpayers paid for it to continue.

102.    Indeed, Elder's statement was no accident.  From at least April 2012 through George Floyd's death in May 2020, MPD policy 5-311 allowed officers to employ "neck restraints" on subjects, defining such restraints as "non-deadly force" despite their obvious risks.

103.    MPD policy defined a neck restraint as "[c]ompressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck)."  MPD trained its officers that a "proper" neck restraint – as if such a thing exists – required officers to "[c]ompress veins, arteries, nerves & muscles of the neck."

104.    MPD trained officers that such a restraint was "non-deadly force" even though it carried with it a reasonable likelihood of death or serious bodily harm.

105.    Consistent with this policy, training materials provided in 2014 to MPD officers (including Defendant Chauvin) depict an officer kneeing on the neck of a handcuffed arrestee in a prone position.

106.    Restraining arrestees by the neck in this matter is inherently dangerous.

107.    Nevertheless, MPD actively encouraged and condoned the use of such restraint at all times material herein.

92775553.1

108.    The MPD has used neck restraints in over 230 arrests since 2015.  44 of those individuals were rendered *unconscious*, 60% of whom were Black.[8]

### THE CITY ALLOWS DEFENDANT CHAUVIN TO RUN AMOK

109.    Defendant Chauvin, like MPD officers Bronson, Pucely, Thao, and many others, engaged in repeated misconduct with the City's tacit authorization.  Indeed, Defendant Chauvin was a serial predator, repeatedly stalking and attacking vulnerable persons of color, whether they be minors, mentally ill, or otherwise – they were all prey!

110.    Defendant Chauvin became an MPD officer in 2001.  This provided him over fifteen years to steep in the culture that led officers to understand they were free to use excessive force with impunity.

111.    Prior to his encounter with Zoya in June 2017, Defendant Chauvin had at least sixteen civilian complaints levied against him.  The only consequence of these complaints was, at most, two letters of reprimand.

112.    In 2005, Defendant Chauvin participated in a reckless police chase resulting in three deaths.

113.    In another incident in November 2013, Defendant Chauvin and other officers pulled over LeSean Braddock, a Black mental-health worker at Hennepin County Medical Center.  They roughly dragged him from his car and slammed him to the ground, then kneed on his neck and back as he lie prone.

---

[8] https://www.blackenterprise.com/minneapolis-police-have-used-neck-restraints-in-over-200-arrests-since-2015-leaving-dozens-unconscious/

114.    Each of these incidents resulted in a complaint being lodged against Defendant Chauvin with the MPD.  Yet none resulted in any discipline being imposed upon him.  Instead, the MPD perversely responded by allowing Defendant Chauvin to assume the role of field-training officer.

115.    The failure to level any real discipline against him or other MPD officers caused Defendant Chauvin to freely and openly violate Zoya's constitutional rights on June 25, 2017.

116.    Notably, within three months of using excessive force against Zoya, Defendant Chauvin used excessive force again, this time against John Pope, a 14-year-old Black boy.

117.    In that instance, Defendant Chauvin struck Pope in the head repeatedly with a large metal flashlight, grabbed him around the throat and pinned him against a wall, placed him in a chokehold, and then forced him into the floor with his knee – while Pope was handcuffed and non-resisting – for more than fifteen minutes.

118.    Pope, like Zoya, was subjected to excessive force by Defendant Chauvin. Defendant Chauvin employed his signature move against each, subjugating these vulnerable Black citizens by pressing down on them with his knee to their necks after they had already been handcuffed and posed no threat.

119.    Indeed, both were subjected to *deadly* force by Defendant Chauvin.  Both reasonably feared for their lives.

120.    Despite knowledge of Defendant Chauvin's long history of misconduct, the evidence of which (including the incident involving Pope) is under the City's and MPD's

control and archived in Evidence.com – the storage system created by the City's BWC

manufacturer (AXON) to be a "comprehensive evidence management system" to make

"evidence more manageable" – City policymakers allowed Defendant Chauvin to stay on

the force long enough to murder George Floyd on May 25, 2020.

121.    Defendant Chauvin killed Floyd using his signature move – a knee to the

neck – which, although deadly force as applied to Zoya and John Pope, miraculously had

not yet killed someone before Floyd's murder.

122.    Defendant Chauvin violated all of their civil rights—and likely many

others'—with the City's express or tacit approval.

123.    Indeed, Defendant Chauvin's signature move even against handcuffed and

controlled arrestees had already been met with approval by MPD policymakers, after

David Smith was killed – resulting in a multi-million-dollar settlement – without any

disciplinary measures taken against the offending officers.  Instead, the City continued to

train its officers that kneeing on the necks of subdued arrestees was appropriate and

lawful.

## THE INDICENT WITH ZOYA

124.    On June 25, 2017, Defendants Chauvin and Blair were dispatched to a

residence on Oakland Avenue South in Minneapolis at approximately 5:30 p.m.

125.    Zoya's mother had called police and alleged that Zoya had assaulted her

and strangled her with an extension cord.

126.    Zoya left the residence before Defendants Chauvin and Blair arrived.

127.    Zoya returned to the residence after the officers arrived.

128.   Defendants Chauvin and Blair were inside the residence when Zoya returned.

129.   Zoya was significantly smaller than each officer.

130.   Zoya walked into the main living area and started to walk by Defendant Chauvin.

131.   Defendant Chauvin grabbed Zoya, spun her around, and began to place her in handcuffs.  A brief struggle ensued with Defendants Chauvin and Blair before the handcuffing.  At no point in time did Zoya pose an immediate threat to the Defendant officers.

132.   Defendants Chauvin and Blair took Zoya to the ground and handcuffed her without incident.

133.   After she was taken down, Zoya exclaimed, "That's why people dead now."  Soon thereafter she yelled, "You wanna see me murdered?!"

134.   After being handcuffed behind her back, Zoya never actively resisted arrest or attempted to evade arrest by flight.

135.   After being handcuffed behind her back, Zoya never posed an immediate threat to the safety of officers or others.

136.   The most Zoya did was refuse to stand up when commanded by Defendants Chauvin and Blair.  Zoya said, "I'm resisting."  One of the officers replied, "No.  You're not."  Her comment did not equate to action aside from refusing to stand.

92775553.1

137.   Defendant Chauvin then began applying upward force to Zoya's handcuffed arms—moving them awkwardly towards her head behind her back.  Zoya stated, "This is how Black people get treated."

138.   Defendant Chauvin responded by torquing Zoya's handcuffed arms upward.  Zoya said "Ow!" in response to this punitive use of force.  The below screenshot is taken from Defendant Blair's BWC, showing Defendant Chauvin wrenching Zoya's handcuffed arms up behind her head.  Zoya is face-down in this picture:



139.   Defendant Chauvin carried Zoya out of the residence by her arms—both of which were still handcuffed behind her and being forced upward—while Defendant Blair (at least at times) carried her by the feet.

92775553.1

140.    Outside the residence, Defendant Chauvin gratuitously slammed Zoya's unprotected head on the ground.  Then he immediately took his signature pose, kneeing on the back of Zoya's neck.

141.    With Zoya handcuffed in the prone position, it is clear from Defendant Blair's BWC that Defendant Chauvin's knee is on Zoya's neck at 22:49:34 on the BWC:



142.    Defendant Chauvin's knee remained in the same position for several minutes, as shown below at 22:51:11 on Blair's BWC:

92775553.1



143.   Zoya remained cuffed and essentially motionless in the prone position as Defendant Chauvin kneed on her neck, with neither officer checking her condition.   Zoya asked, "How long are we gonna stay like this?"  Defendant Chauvin did not take any action in response, remaining on Zoya's neck:



144.   Zoya went on to ask, "Can you get off my neck?"  Having no success she tried reverse psychology, saying, "Push harder."  Defendant Chauvin was not phased.

145.   Zoya continued, "That's how they kill Black people in America."

146.   Remarkably, despite the prone and controlled Zoya lying on the ground, Defendant Chauvin asked Defendant Blair to retrieve a hobble from the officers' squad car.  A hobble is a device limiting a person's motion by tethering her legs together and securing them to her waist.

147.   With Defendant Blair's direct participation, Defendant Chauvin decided to subject Zoya to yet another dangerous and humiliating use of police force.  She, like Pope and Floyd later, was prey to this serial predator.

148.   Under MPD policy 5-316 then in effect, use of a hobble was appropriate only where arrestees were "combative" *and* "pose[d] a threat to themselves, officers, or others."

149.   None were true of the subdued, prone, and handcuffed Zoya.  Use of the hobble violated policy and was objectively unreasonable, as Zoya remained handcuffed and not resisting.

150.   Nevertheless, the officers applied the hobble, as depicted at 22:52:55 on Defendant Blair's BWC:



151.   Zoya remained limp throughout the hobbling process and stated, "This is how they do it in America."

152.   Incredibly, Defendant Chauvin stayed on Zoya's neck for more than a minute *even after she was hobbled*.

153.   He finally got off of her at 22:54:16 on Blair's BWC.

154.   At that point, the Defendant officers carried Zoya into their squad car. Defendant Chauvin decided to carry her by one arm:

92775553.1



155.    All told, Defendant Chauvin remained on Zoya's neck for 4 minutes and 41 seconds.

156.    At the squad car, Zoya banged on the side, as she did not want to ride to jail with the Defendant officers.  She yelled that they would have to shoot her before she would ride in the car with them.  She said, "You not gonna kill me like y'all did Philando," referring to Philando Castille, and added, "You already put your knee where it wasn't supposed to go."

157.    MPD Sergeant Tammy Werner responded to the scene, apparently in response to Zoya being hobbled.  Sergeant Werner approved the Defendant officers' use of force against Zoya.  Zoya was then transported to the Hennepin County Jail and booked.

92775553.1

158.   Prior to the Defendant officers' encounter with Zoya, the MPD embraced a militaristic culture where unnecessary drama often was injected into situations by officers.

159.   The BWC footage in this case establishes the same phenomenon. Defendant Chauvin kneed on Zoya's neck for almost five minutes while she was fully controlled and motionless, all while Defendant Blair failed to intervene.  In fact, Defendant Blair participated in the illegal seizure by hobbling Zoya as she laid handcuffed and motionless.

160.   Nevertheless, MPD Sergeant Tammy Werner later reviewed and approved the officers' use of force against Zoya.

161.   Zoya never presented an immediate threat to the safety of officers or others from the time she first encountered Defendants Chauvin and Blair on June 25, 2017, through her booking at the Hennepin County Jail that evening.

162.   Zoya never actively resisted arrest or attempted to evade arrest by flight from the time she first encountered Defendants Chauvin and Blair on June 25, 2017, through her booking at the Hennepin County Jail that evening.

163.   Though Zoya was charged with domestic assault arising out of the incident, that charge was later dropped.

164.   At approximately 8:47 pm on June 25, 2017, Defendant Chauvin prepared a report about the encounter with Zoya.

165.   In that report, Defendant Chauvin lied about his actions that evening and omitted the true extent of his assault against Zoya.

92775553.1

166.     Defendant Chauvin nowhere reported that, in chicken-wing fashion, he carried the *handcuffed-behind-her-back* Zoya out of the residence, or that he dropped her face first onto the ground while she was unable to protect herself from the impact due to the handcuffs.

167.     Indeed, Defendant Chauvin reported that Zoya was simply "set down on the grass near the sidewalk in front of the house."  This was a lie.

168.     Furthermore, while Defendant Chauvin reported that he "kept body weight to pin" Zoya to the ground as Defendant Blair pulled up the squad car, he nowhere reported that such body weight was being applied to Zoya's *neck*, that he applied it for nearly five minutes while Zoya was handcuffed and controlled, or that he stayed on Zoya's neck long after the squad car had been retrieved.

169.     Defendant Blair also wrote a report that evening about the encounter with Zoya.

170.     Like Defendant Chauvin, nowhere in his report did Defendant Blair document that Defendant Chauvin pinned Zoya to the ground with his knee to her neck and kept it there long after she had been handcuffed and was not resisting.

171.     Each of these reports was designed to prevent any accountability for the misconduct committed by Defendants Chauvin and Blair.  Each covered for his brother in blue.

172.     The material lies and omissions in the officers' reports are the type that MPD rank and file are accustomed to making without consequence or repercussion from supervisors such as Sergeant Werner and those all the way up the chain of command.

173.    Upon information and belief, neither Defendant Chauvin nor Defendant Blair was disciplined by the City of Minneapolis as a result of their interactions with Zoya on June 25, 2017.

**DEFENDANT CHAUVIN MURDERS GEORGE FLOYD AND IS CHARGED**

174.    Despite knowledge of and access to evidence of his numerous incidents of misconduct, including the incidents concerning Zoya and John Pope, MPD supervisors left Defendant Chauvin free to prowl for more Black persons to subjugate and torture.

175.    The consequences of their inaction were tragic.  On May 25, 2020, Defendant Chauvin murdered George Floyd in broad daylight, using his signature knee-to-the-neck to suffocate Floyd over more than eight minutes.

176.    Had MPD disciplined Defendant Chauvin for his conduct involving Zoya or John Pope, history could have been stopped from repeating itself with George Floyd. But what else could be expected from the MPD?

177.    On April 20, 2021, a Hennepin County jury found Defendant Chauvin guilty of murdering George Floyd.

178.    Approximately two weeks later, on May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in case number 21-CR-00108 (PAM/TNL) against Defendant Chauvin, charging him with criminal civil-rights violations in connection with his treatment, and the death, of George Floyd.

179.    That same day, a federal grand jury in the District of Minnesota returned an Indictment in case number 21-CR-00109 (WMW/HB), charging that on September 4, 2017, Defendant Chauvin deprived John Pope of the rights secured and protected by the

31

Constitution of the United States to be free from unreasonable search and seizure, which includes the right to be free from the use of unreasonable force.  A true and correct copy of that Indictment is attached hereto as Exhibit B.

180.    The Indictment regarding Defendant Chauvin's attack of John Pope charged, in Count I, that Defendant Chauvin, without legal justification, held Pope by the throat and struck him multiple times with a flashlight, a dangerous weapon.  That Indictment, in Count II, further charged that Defendant Chauvin "held his knee on the neck and upper back of [Pope] even after [Pope] was lying prone, handcuffed and unresisting."

181.    On December 15, 2021, Defendant Chauvin pleaded guilty to the conduct charged in each of these federal Indictments.  A true and correct copy of Defendant Chauvin's Plea Agreement and Sentencing Stipulations (the "Plea Agreement") is attached hereto as Exhibit C.

182.    In the Plea Agreement, Defendant Chauvin admitted that, while acting under color of law as an MPD officer on September 4, 2017, he willfully deprived John Pope of his constitutional rights – specifically, the right to be free from an unreasonable seizure, which includes the right to be free from the use of unreasonable force by a police officer.

183.    In the Plea Agreement, Defendant Chauvin admitted that, without legal justification, he held John Pope by the throat and struck him multiple times in the head with a dangerous weapon – namely, his flashlight – resulting in bodily injury to Pope.

92775553.1

184.    In the Plea Agreement, Defendant Chauvin admitted that, without legal justification, he held his knee on John Pope's neck, shoulders, and upper back even after Pope was lying prone, handcuffed, and unresisting, resulting in bodily injury.

185.    In the Plea Agreement, Defendant Chauvin admitted that "at no point in the encounter did [John Pope] use force or threaten the use of force against the officers" on September 4, 2017.

186.    In the Plea Agreement, Defendant Chauvin admitted that "[t]hroughout the encounter," he "was aware that [John Pope] was 14 years old and that [Pope] made no aggressive moves towards the officers."

187.    In the Plea Agreement, Defendant Chauvin admitted that "[a]s the officers began to take [John Pope] into custody, [Pope] attempted to explain the situation with his mother and pulled away. After this initial encounter, [Defendant Chauvin] used unreasonable and excessive force on [Pope] by striking him in the head multiple times with a police-issue flashlight.  [Defendant Chauvin] then pinned [Pope] to the wall by his throat and again struck [Pope] in the head with his flashlight.  [Defendant Chauvin's] strikes caused a wound near [Pope's] left ear."

188.    In the Plea Agreement, Defendant Chauvin "admit[ted] he also used unreasonable and excessive force on [John Pope] by holding his knee on [Pope's] neck, shoulders, and upper back for between fifteen and sixteen minutes.  During this period, [Pope] was face-down on the floor, handcuffed, and unresisting.  During [Defendant Chauvin's] restraint, [Pope] cooperated with police directions and, at times, cried from pain."

33

189.    In the Plea Agreement, Defendant Chauvin admitted that his conduct against John Pope on September 4, 2017, was willful and that he knew, from MPD policies and training, that strikes to the head were considered deadly force and that deadly force was appropriate only when a person presents a risk of death or great bodily harm to the officer.

190.    In the Plea Agreement, Defendant Chauvin also admitted that he had been trained that "if an arrestee is in the prone position, that position may make it more difficult to breathe, and thus, officers should move that arrestee to a side recovery or seated position."

191.    In the Plea Agreement, Defendant Chauvin also admitted that his use of unreasonable force was willful, as "evidenced by the report [he] wrote about the incident in which he omitted that he repeatedly struck [John Pope] in the head with a flashlight, grabbed [Pope] by the throat, and used his knee to pin [Pope] to the ground for more than fifteen minutes."

192.    And, in the Plea Agreement, Defendant Chauvin admitted that his willful uses of unreasonable force on September 4, 2017, resulted in bodily injury to John Pope.

193.    Relegated to the status of his preferred victims, Defendant Chauvin finally had to tell the truth to strike his plea deal.

194.    The Plea Agreement removes any doubt that Chauvin used excessive force by pinning the handcuffed, non-resisting Zoya to the ground with his knee to her neck for more than four minutes, and that he did so knowing such conduct was unlawful.

34

92775553.1

## ZOYA'S INJURIES

195.   Zoya, like John Pope, was injured as a result of the use of excessive force against her on June 25, 2017.

196.   Within days of the incident, she presented at her clinic complaining of anxiety, depression, and insomnia.  She also complained of fatigue, irritability, and changes in appetite as a result of the June 25 incident.

197.   Zoya also reported pain from, and myalgia due to, the arrest.

198.   Zoya was prescribed Hydroxyzine to help her sleep and referred for a behavioral-health assessment.

199.   At that assessment on July 12, 2017, Zoya was diagnosed with "major depressive disorder, single episode, moderate" and "unspecified trauma- and stressor-related disorder."  It was noted that her mental-health problems were affecting her ability to function in multiple contexts/settings and causing her "clinically significant distress."

200.   Though Zoya had previously suffered from PTSD, her symptoms were minimal and well-managed until the incident on June 25 – after which they "increased in severity to a significant degree."

201.   The assessing psychologist reported that Zoya needed a further work-up for post-traumatic stress disorder (PTSD), although he noted that she tested positive on a "Primary Care PTSD Screen."

202.   Following the assessment, Zoya began attending therapy for her mental-health issues, although at times she attended only intermittently because she was homeless, had problems with transportation, or was in pain due to a later-suffered car

35

accident. She continued to report depression, anxiety, and mood changes as a result of her interactions with Defendants Chauvin and Blair on June 25, 2017.

203. It was noted that Zoya needed ongoing psychotherapy to stabilize her mood and provide her counseling and support.

204. By February of 2018, Zoya was diagnosed as suffering from PTSD and from recurrent major depression.

205. Zoya was and continues to be traumatized by the actions of Defendants Chauvin and Blair and, in particular, Defendant Chauvin's inhumane treatment and torture of her.

206. The United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment defines the word "torture" to mean "an extreme form of cruel and inhuman punishment committed under the color of law." The Convention "allows for no circumstances or emergencies where torture would be permitted."

207. The United States is a signatory to, and ratifier of, the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

208. Defendant Chauvin tortured Zoya by subjecting her to extreme cruel and inhuman treatment under color of law. Chauvin treated Zoya like chattel.

209. Zoya has experienced and continues to experience flashbacks to the night in question – including when Defendant Chauvin murdered George Floyd three years after he assaulted Zoya. She still has difficulty sleeping and experiences nightmares.

210.   Defendant Chauvin is the most notorious police officer in Minnesota – if not United States – history.  This exacerbates Zoya's emotional suffering and increases the frequency of her flashbacks, as Defendant Chauvin's name is repeatedly in the news. Indeed, every person in this state likely knows the name Derek Chauvin; Zoya cannot easily avoid hearing about him, emotionally bringing her back to June 25, 2017.

211.   Zoya has difficulty discussing with others the events of June 25, 2017.  She is guarded and hesitant to relive the trauma.

212.   Zoya has suffered and will continue to suffer from PTSD, potentially for the rest of her life.

213.   Zoya continues to attend counseling and therapy to address her significant emotional distress and PTSD resulting from the events of June 25, 2017.

## COUNT I

### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Derek Chauvin in his individual capacity*

214.   Zoya realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

215.   By the actions described above, Defendant Derek Chauvin, under color of state law, violated and deprived Zoya of her clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

216.   Defendant Chauvin subjected Zoya to these deprivations of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

217.    As a direct and proximate result of the acts and omissions of Defendant

Chauvin, Zoya suffered injuries, was forced to endure great pain and mental suffering

and was damaged in an amount to be determined by the jury.

218.    Punitive damages in an amount to be determined by the jury are available

against Defendant Chauvin and are hereby claimed as a matter of federal common law

under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading

requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

219.    Zoya is entitled to fully recover her costs, including reasonable attorneys'

fees, under 42 U.S.C. § 1988.

## COUNT II

**RACE DISCRIMINATION – FOURTEENTH AMENDMENT VIOLATION**
***Plaintiff v. Defendant Derek Chauvin in his individual capacity***

220.    Zoya realleges and incorporates by reference herein each and every

allegation contained in each paragraph above as though fully set forth herein.

221.    The United States Constitution prohibits selective enforcement of the law

based on considerations of race.

222.    Specifically, the Equal Protection Clause of the Fourteenth Amendment

prohibits intentionally discriminatory policing by members of law enforcement.

223.    By the actions described above, Defendant Derek Chauvin, under color of

state law, violated and deprived Zoya of her clearly established and well-settled civil

rights to be free from race discrimination under the Fourteenth Amendment to the United

States Constitution.

92775553.1

224.   Zoya's race (Black) was the but-for cause of Defendant Chauvin's conduct against Zoya on June 25, 2017.

225.   Defendant Chauvin subjected Zoya to the deprivation of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

226.   As a direct and proximate result of the acts and omissions of Defendant Chauvin, Zoya suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount to be determined by the jury.

227.   Punitive damages in an amount to be determined by the jury are available against Defendant Chauvin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

228.   Zoya is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Ross Blair in his individual capacity*

229.   Zoya realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

230.   By the actions described above, Defendant Ross Blair, under color of state law, violated and deprived Zoya of her clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

92775553.1

231.    Further, by the actions described above, Defendant Blair, under color of state law, violated and deprived Zoya of her clearly established and well-settled civil rights under the Fourth and Fourteenth Amendments by failing to intervene in response to Defendant Chauvin's unconstitutional use of force, with the realistic opportunity to do so.

232.    Defendant Blair subjected Zoya to these deprivations of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

233.    As a direct and proximate result of the acts and omissions of Defendant Blair, Zoya suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount to be determined by the jury.

234.    Punitive damages in an amount to be determined by the jury are available against Defendant Blair and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

235.    Zoya is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT IV

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
### *Plaintiff v. Defendant City of Minneapolis*

236.    Zoya realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

237.    Before June 25, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or

40

ratified a custom, pattern or practice on the part of its officers of the improper use of force, including deadly force.

238.     By failing to discipline all officers consistently on this point, City and MPD policymakers, with the department's ratification and approval, have approved of a deficient policy, custom, or practice of the improper use of force, including deadly force.

239.     Further, before June 25, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including Defendant Chauvin herein, of the use of deadly force when none was justified, specifically, the use of neck restraints on arrestees who had been handcuffed or otherwise were under officers' control.

240.     Zoya's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount to be determined by the jury.

241.     Zoya is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d *et seq.* *Plaintiff v. Defendant City of Minneapolis*

242.     Zoya realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

92775553.1

243.   Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination based on race by entities that receive federal financial assistance.

244.   The City of Minneapolis and the MPD receive federal financial assistance.

245.   The City of Minneapolis, through the MPD, has engaged and continues to engage in a pattern and practice of race discrimination in its policing practices.

246.   As set forth above, MPD stops, arrests, and uses force against Black individuals at significantly higher rates than white individuals in similar circumstances.

247.   The disproportionate impact of policing practices on Black individuals, and the failure to address it despite knowledge by City and MPD leaders, evidences a policy or custom of intentional race discrimination by the MPD.

248.   Zoya's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's and MPD's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount to be determined by the jury.

249.   Zoya is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Zoya Code prays for judgment as follows:

1.   That this Court find that the Defendants committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983, and Title VI of the Civil Rights Act;

92775553.1

2.      As to Count I, a money judgment against Defendant Chauvin for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against the Defendant Chauvin for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant Blair for compensatory damages and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against the City of Minneapolis for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against the City of Minneapolis for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

7.      For an order mandating changes in the policies and procedures of the Minneapolis Police Department requiring, among other things, policy and training measures in the proper use of restraint techniques and the risks of positional asphyxia, the

92775553.1

proper reporting of use of force, and the obligation to intervene when observing the

unlawful use of force by other officers; and

8.      For such other and further relief as this Court may deem just and equitable.

**ZOYA DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

Dated:  May 31, 2022                    **ROBINS KAPLAN LLP**

                                        s/Robert Bennett
                                        Robert Bennett, #6713
                                        Andrew J. Noel, #322118
                                        Kathryn H. Bennett, #0392087
                                        Marc E. Betinsky, #0388414
                                        Greta A. Wiessner, #0401130
                                        800 LaSalle Ave, Suite 2800
                                        Minneapolis, MN 55402
                                        Telephone:  612-349-8500
                                        rbennett@robinskaplan.com
                                        anoel@robinskaplan.com
                                        kbennett@robinskaplan.com
                                        mbetinsky@robinskaplan.com
                                        gwiessner@robinskaplan.com

                                        *Attorneys for Plaintiff Zoya Code*

92775553.1