# EXHIBIT A



# Investigation into the City of Minneapolis and the Minneapolis Police Department

Findings from the Minnesota Department of Human Rights

April 27, 2022

# Table of Contents

Investigation into the City of Minneapolis and the Minneapolis Police Department ................................ 1

  Table of Contents ................................................................................................................. 2

  Summary of investigation and findings of discrimination ................................................... 5

    Court order implementing public safety changes ............................................................ 5

    Overview of investigation ................................................................................................ 6

    Findings of Discrimination .............................................................................................. 8

  MPD officers use higher rates of more severe force against Black individuals than white individuals in similar circumstances ................................................................................... 10

    MPD officers inappropriately use neck restraints and chemical irritants ....................... 11

    MPD officers use higher rates of more severe force against Black individuals ............... 11

  MPD officers are more likely to stop vehicles with people of color and Indigenous individuals when officers are more likely to identify the race/ethnicity of a vehicle's occupants ................. 20

  MPD officers treat Black and white individuals differently during traffic stops ................. 23

    MPD officers are more likely to search Black individuals and/or their vehicles during a traffic stop than white individuals in similar circumstances ................................................ 23

    MPD officers are more likely to cite Black individuals during a traffic stop than white individuals in similar circumstances ................................................................................ 25

    MPD officers are more likely to stop Black individuals for longer during a traffic stop than white individuals .................................................................................................... 27

    MPD officers are more likely to use force against Black individuals during a traffic stop than white individuals in similar circumstances ............................................................. 27

    MPD officers are more likely to arrest Black individuals during traffic stops than white individuals in similar circumstances ............................................................................... 28

  MPD officers improperly and excessively cite Black individuals with disorderly conduct and obstruction resulting in collateral consequences ................................................................. 31

    MPD officers improperly and excessively cite Black individuals ....................................... 31

Collateral consequences of unjustified citations to Black individuals ................................................33

MPD uses covert social media to target Black leaders, Black organizations, and elected officials without a public safety objective ................................................................................................................35

MPD's covert social media accounts were used to conduct surveillance, unrelated to criminal activity, and to falsely engage with Black individuals, Black leaders, and Black organizations ........35

MPD officers used covert accounts to pose as community members to criticize elected officials ..36

MPD does not have proper oversight and accountability mechanisms for officers' covert social media use ....................................................................................................................................36

MPD maintains a culture where MPD officers consistently use racist, misogynistic, and disrespectful language and are rarely held accountable..........................................................................................38

MPD provides deficient training and guidance for its officers, which exacerbates a pattern of discriminatory, race-based policing...........................................................................................................39

MPD reinforces a culture of unquestionable compliance and aggression ......................................40

MPD officers receive insufficient in-service training..........................................................................41

Insufficient supervisor training reinforces a culture that is averse to oversight and accountability 42

MPD's field training program furthers a pattern of race-based policing ...........................................43

MPD's emphasis on aggression during training results, in part, in officers unnecessarily escalating encounters and/or using inappropriate levels of force with community members........................44

Officers are not held accountable because of ineffective accountability and oversight systems, which contribute to a pattern of discriminatory policing ..............................................................................48

Structure ..........................................................................................................................................48

OPCR is not sufficiently independent from MPD ..............................................................................49

The Police Conduct Oversight Commission is ineffective as implemented ......................................51

Complaints are inadequately investigated, and officers are not consistently held accountable for misconduct ..................................................................................................................................52

The City fails to provide individuals of all racial backgrounds accused of crimes with evidence relevant to their defense, and this failure disproportionately affects Black individuals who are arrested and charged at higher rates ......................................................................................................64

The City fails to comprehensively produce impeachment information to individuals of all racial backgrounds charged with crimes ...................................................................................................65

MPD leaders fail to use information about officers' lack of credibility to discipline officers ...........66

Without coordinated and sustained action from City and MPD leaders, MPD's organizational culture will continue to undercut the efficacy of the City's public safety system and perpetuate race-based policing ................................................................................................................................................68

City and MPD leaders acknowledge that MPD engaged and continues to engage in race-based policing and leaders have made some efforts to address racial disparities ......................................68

A lack of collective action has allowed a problematic organizational culture to fester in MPD .......69

Conclusion, recommendations, and next steps ...............................................................................71

Upon request, this information can be made available in alternative formats for individuals with disabilities by emailing info.mdhr@state.mn.us or calling 651.539.1100.

# Summary of investigation and findings of discrimination

On June 1, 2020, the Minnesota Department of Human Rights[1] filed a charge of discrimination against the City of Minneapolis (City) to investigate and determine if the City of Minneapolis and the Minneapolis Police Department (MPD) are in violation of the Minnesota Human Rights Act, Minnesota Statutes, Chapter 363A.12,[2] for a pattern or practice of race discrimination.[3] The Minnesota Department of Human Rights opened its investigation after an MPD officer murdered George Floyd on May 25, 2020.

A pattern or practice of discrimination is present where the denial of rights consists of something more than isolated, sporadic incidents, but is repeated, routine, or of a generalized nature. Such a showing may be made through statistical evidence and/or other examples of specific instances of discrimination.[4]

After completing a comprehensive investigation, the Minnesota Department of Human Rights finds there is probable cause that the City and MPD engage in a pattern or practice of race discrimination in violation of the Minnesota Human Rights Act.[5]

## Court order implementing public safety changes

On June 5, 2020, the Minnesota Department of Human Rights requested a temporary court order from Hennepin County District Court to immediately implement public safety changes. The City agreed to the terms that the Minnesota Department of Human Rights identified. On June 8, 2020, the court entered an order requiring the City and MPD to do the following:

a.  Implement a complete ban, without exception, on the use of chokeholds and neck restraints.

b.  Bolster MPD officers' duty to intervene and report if another officer engages in unauthorized use of force. This includes requiring that officers attempt to safely intervene by verbal *and*

---

[1] The Minnesota Department of Human Rights is the state's civil rights enforcement agency. It is tasked with enforcing the Minnesota Human Rights Act. *See* Minn. Stat. § 363A, *et seq.*

[2] Minn. Stat. § 363A.12, subd. 1 (prohibiting discrimination in public services); *City of Minneapolis, et al. v. Richardson*, 307 Minn. 80 (1976) (holding that racially discriminatory policing is unlawful under the Minnesota Human Rights Act in a case brought by the Minnesota Department of Human Rights against the Minneapolis Police Department).

[3] Because the Minnesota Department of Human Rights completed a pattern or practice investigation, it did not focus its investigation on individual incidents or individual officers. Furthermore, the Minnesota Department of Human Rights did not determine whether the City and MPD violated any federal laws or any state or federal constitutional provisions.

[4] *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

[5] Minn. Stat. § 363A.12, subd. 1 (prohibiting discrimination in public services).

physical means, *regardless* of rank and seniority, noting that failure to do so must result in "discipline to the same severity as if they themselves engaged in the prohibited use of force."

c.  Require that the MPD Chief of Police (Police Chief) authorize the use of crowd control weapons to ensure that MPD officers use these weapons only when appropriate.

d.  Require the Police Chief to issue, within 45 days, final disciplinary decisions on police misconduct cases that were pending the Police Chief's review and issue final disciplinary decisions on all future police misconduct matters within 30 days.[6] This provision also requires the City post all final disciplinary decisions on its website, if and when state law permits.[7]

e.  Require the City to institute a plan to audit MPD officers' body worn camera footage to proactively and strategically identify discriminatory practices and misconduct.[8]

As of August 24, 2020, as required under the court order, the City incorporated these changes into the MPD Policy and Procedure Manual and within corresponding rules and ordinances.[9]

## Overview of investigation

The Minnesota Department of Human Rights conducted an extensive investigation of the City of Minneapolis and the Minneapolis Police Department. The Minnesota Department of Human Rights reviewed approximately 700 hours of body worn camera footage and nearly 480,000 pages of City and MPD documents, such as training materials, policies and procedures, officers' disciplinary records, policy development materials, reports and assessments, internal and external communication and correspondence, documents reflecting interagency agreements, public messaging documents, and data from MPD's covert social media accounts. In addition, the Minnesota Department of Human Rights observed approximately 87 hours of 2021 MPD Academy trainings for new officer hires and completed multiple ride-alongs with MPD officers in each of MPD's five precincts.

The Minnesota Department of Human Rights also analyzed MPD's data on all recorded use of force incidents across MPD's five precincts from January 1, 2010, to December 31, 2020. In addition, the

---

[6] At the time the court order was entered, at least 65 completed police misconduct investigations were awaiting the Police Chief's review and at least four of those cases had been on the Police Chief's desk for over 200 days. As of June 2020, the average time a police misconduct case sat on the Police Chief's desk without a final decision was 88 days.

[7] *See* Disciplinary Decisions, City of Minneapolis, available at www.minneapolismn.gov/resident-services/public-safety/police-public-safety/police-reports-and-data-requests/frequently-requested/disciplinary-decisions/ (last visited Apr. 21, 2022).

[8] Before the court order was entered, MPD's body worn camera footage was audited only to assess whether officers activated their cameras.

[9] *See* Temporary Court Order Changes Embedded in City Ordinance or in Police Department Policy & Procedure Manual, available at https://mn.gov/mdhr/assets/TRO%20Changes%20Embedded%20in%20City%20Ordinance%20or%20in%20Police%20Department%20Policy%20Final_tcm1061-526121.pdf (last visited Apr. 24, 2022).

Minnesota Department of Human Rights analyzed MPD's and the City's data from January 1, 2017, to May 24, 2020, on traffic stops and prosecutions, including searches, arrests, and citations stemming from those stops. A nationally recognized policing statistical expert[10] conducted this comprehensive analysis of MPD's and the City's data.

With assistance from nationally recognized policing experts,[11] who have served as Police Chiefs across the country, the Minnesota Department of Human Rights reviewed MPD's use of force files and alleged police misconduct files. The Minnesota Department of Human Rights worked closely with these policing experts to ensure that the review and assessment of the evidence in this investigation aligns with law, policy where appropriate, and commonly accepted best policing practices. The policing experts also assisted the Minnesota Department of Human Rights with reviewing MPD's policies, written training materials, and MPD's fall 2021 Academy for new police officer hires.

The Minnesota Department of Human Rights interviewed MPD patrol officers, sergeants, lieutenants, command staff, inspectors who serve as the leaders for each of MPD's five precincts, current and former Police Chiefs, current and former Assistant and Deputy Chiefs, police dispatchers, civilian staff, and community navigators who serve as liaisons between MPD and specific community groups. The Minnesota Department of Human Rights visited each of the five precincts on multiple occasions to meet with officers, who shared their experiences and perspectives.

The Minnesota Department of Human Rights also interviewed City of Minneapolis staff who are involved with the City's public safety system and elected officials, including current and former Mayors and City Council Members, Minneapolis Department of Civil Rights staff, Office of Police Conduct Review staff, Office of Violence Prevention staff, Human Resources staff, appointed members of the Police Conduct Oversight Commission, and prosecutors from the City Attorney's Office.

Additionally, the Minnesota Department of Human Rights interviewed prosecutors from the Hennepin County Attorney's Office, Hennepin County Public Defenders, Minneapolis firefighters, health care professionals in Minneapolis, private attorneys in the Twin Cities, and representatives from violence prevention and support services organizations in Minneapolis.

The Minnesota Department of Human Rights also interviewed and reviewed statements from over 2,200 community members about their experiences with MPD. Community members shared their experiences in-person, over the phone, by video, or through written submissions – detailing their

---

[10] Greg Ridgeway is a Professor of Criminology, Statistics, and Data Science at the University of Pennsylvania and Chair of the Department of Criminology. Professor Ridgeway has worked with numerous police departments in applying analytical methods to study police practices including the Cincinnati Police Department, New York City Police Department, Maricopa County Sheriff Office, Chicago Police Department, Philadelphia Police Department, and Baltimore Police Department working alongside court-appointed monitors, the Civil Rights Division of the United States Department of Justice, and the Illinois Attorney General's Office.

[11] 21CP Solutions is an organization that is comprised of policing experts such as police chiefs, lawyers, and social scientists, who have significant experience working on major assessments, monitoring, and oversight projects related to public safety.

experiences from 2010 to 2020. Additionally, the Minnesota Department of Human Rights conducted 15 listening sessions with neighborhood associations and organizations across Minneapolis.

The Minnesota Department of Human Rights also participated in a series of community engagement events called Time of Reckoning, a year-long series focused on the criminal justice system. The Minnesota Department of Human Rights also met with an additional 18 community-based organizations to review the court order described above, share information on how community members could connect with investigators, and answer questions about the investigation.

## Findings of Discrimination

The Minnesota Department of Human Rights finds there is probable cause that the City and MPD engage in a pattern or practice of race discrimination in violation of the Minnesota Human Rights Act.

Specifically, the Minnesota Department of Human Rights finds that MPD engages in a pattern or practice of discriminatory, race-based policing as evidenced by:

- Racial disparities in how MPD officers use force, stop, search, arrest, and cite people of color, particularly Black individuals, compared to white individuals in similar circumstances.
- MPD officers' use of covert social media to surveil Black individuals and Black organizations, unrelated to criminal activity.
- MPD officers' consistent use of racist, misogynistic, and disrespectful language.

The pattern or practice of discriminatory, race-based policing is caused primarily by an organizational culture where:

- MPD officers, supervisors, and field training officers receive deficient training, which emphasizes a paramilitary approach to policing that results in officers unnecessarily escalating encounters or using inappropriate levels of force.
- Accountability systems are insufficient and ineffective at holding officers accountable for misconduct.
- Former and current City and MPD leaders have not collectively acted with the urgency, coordination, and intentionality necessary to address racial disparities in policing to improve public safety and increase community trust.

Without fundamental organizational culture changes, reforming MPD's policies, procedures, and trainings will be meaningless.

At its core, organizational culture is created by the tone set by an organization's leaders, how culture norms are taught and reinforced, and the consequences for violating those norms. Organizational culture is shaped and demonstrated through consistent behavior. Therefore, without fundamental organizational culture change, reforming MPD's policies, procedures, and trainings will be meaningless. In the absence of collective and sustained action from City and MPD leaders, MPD's existing organizational culture will continue, as will its pattern or practice of race-based policing, undermining the City's public safety system.

As described in detail throughout these findings, MPD maintains an organizational culture where officers are trained to be aggressive towards community members, which leads to officers escalating situations and often using inappropriate levels of force. The accountability systems in place are insufficient and ineffective at holding officers accountable. Instances of police misconduct are not properly investigated, not timely addressed, and officers are not held consistently accountable.

The lack of collective and sustained action among City and MPD leaders has, in effect, allowed this organizational culture to fester within MPD and resulted in unlawful policing practices that undermine public safety.

City and MPD leaders have been aware of the long-standing, disproportionate impact of race-based policing on people of color and Indigenous individuals, especially Black individuals. Yet, these leaders have not collectively acted with the urgency, coordination, and intentionality necessary to address racial disparities to improve public safety. These City and MPD leaders include past and present elected and appointed officials, such as the Mayors, who ultimately oversee the Police Chiefs; City Council Members, who approve the City's and MPD's budget; and the Police Chiefs, who work with the command staff and high-level MPD officials to direct policy and effectuate change. Other departments within the City also have played and continue to play an important role in the accountability systems for police officers. This includes the Minneapolis Civil Rights Department, which reviews complaints of alleged police misconduct and oversees the Office of Police Conduct Review, and the City Attorney's Office, which prosecutes individuals based on citations issued by MPD officers.

## MPD officers use higher rates of more severe force against Black individuals than white individuals in similar circumstances

One of the most powerful indicators of how organizational culture manifests is to examine the conduct of an organization's members. As noted above, organizational culture is created and demonstrated through consistent and collective behavior. Community members of color and Indigenous individuals reported many instances of MPD officers using excessive and violent force against them.

In some cases, the force MPD officers use against people of color and Indigenous individuals has been deadly. In fact, since 2010, of the 14 individuals that MPD officers have killed, 13 of those individuals were people of color or Indigenous individuals.[12] People of color and Indigenous individuals comprise approximately 42% of the Minneapolis population,[13] but comprise 93% of all MPD officer-involved deaths between January 1, 2010, to February 2, 2022. In other words, MPD officers have disproportionately killed community members of color and Indigenous community members.[14]

Police officers may use some method of force to arrest and detain an individual, if appropriate. Over the past decade, MPD policy has directed officers to consider a continuum of force options[15] when faced with a situation where using force is appropriate. The continuum starts with soft tactics, such as holding or pushing someone, and progresses to more forceful tactics, such as using chemical irritants, tasers, and firearms.

With the assistance from a nationally recognized statistical expert in analyzing policing data, the Minnesota Department of Human Rights investigated racial disparities in MPD's use of force data.

As described in more detail below, MPD officers use disproportionately, higher rates of more severe force against Black individuals, and this remains true even when comparing MPD officers' use of force against Black and white individuals in similar circumstances.

---

[12] Jeff Hargarten, et al., *Every Police-Involved Death in Minnesota Since 2020*, Star Trib. (Feb. 2, 2022), available at https://www.startribune.com/every-police-involved-death-in-minnesota-since-2000/502088871/.

[13] *See* Quick Facts, Minneapolis, United States Census Bureau, 2021, available at census.gov/quickfacts/minneapoliscityminnesota (last visited Apr. 25, 2022).

[14] While these individual incidents were not the focus of this pattern or practice investigation, they are important context for the way in which MPD officers use force.

[15] MPD's use of force continuum, from lowest level of force to highest level of force, is as follows: officer presence, verbalization, joint manipulation/escort holds, distraction techniques/controlled takedowns/conscious neck restraints, taser/chemical irritant, unconscious neck restraints, striking batons, and firearms. Neck restraints are prohibited under MPD's updated use of force policy as of June 16, 2020. However, in the instructional graphics in MPD's Fall 2021 Academy training materials, MPD has not removed neck restraints from their use of force continuum. Rather, MPD simply placed a strike through "neck restraints" in the continuum and noted that the use of neck restraints currently violates policy.

## MPD officers inappropriately use neck restraints and chemical irritants

Expert review of a statistically representative sample of 300 of MPD's use of force files from January 1, 2010, to December 31, 2020,[16] demonstrates that MPD officers used unnecessary and inappropriate levels of force in 52.6% of incidents in which they used a neck restraint, and in 37.1% of incidents in which they sprayed chemical irritants against individuals of all racial and ethnic backgrounds.[17]

Several factors were assessed to determine whether MPD officers used appropriate levels of force when reviewing the representative sample of use of force files. According to policing practice experts, when analyzing any use of force incident, officers must only use force that is necessary, proportional, objectively reasonable, and consistent with the affirmative duty to de-escalate.[18] As of at least June 2012, MPD has had a policy requiring officers to consider de-escalation and non-force options where appropriate. To determine whether MPD officers' use of force satisfied these criteria, the review included details such as: what information was available to officers in advance of responding to an incident or call for assistance; what information officers learned while on the scene; and officers' actions, language, and reasonable tools available to them for de-escalation.

## MPD officers use higher rates of more severe force against Black individuals

MPD's data and force files were further assessed to determine whether MPD officers treat Black and white individuals differently when using neck restraints and chemical irritants.

MPD officers use higher rates of more severe force against Black individuals. In fact, MPD officers use force against Black individuals at a rate that is significantly disproportionate to the size of the Black population in Minneapolis. Although Black individuals comprise approximately 19% of the Minneapolis population,[19] MPD's data shows that between January 1, 2010, to December 31, 2020, 63% of all use of force incidents that MPD officers recorded were against Black individuals.

> Although Black individuals comprise about 19% of the Minneapolis population, 63% of all use of force incidents that MPD officers recorded were against Black individuals.

---

[16] The sample of cases was weighted to closely represent all of MPD's recorded use of force incidents from January 1, 2010, to December 31, 2020, in terms of the type of force used by an officer, the race of the individual against whom the officer used force, and whether the incident was coded as a crisis intervention incident involving an individual experiencing a mental or behavioral health crisis.

[17] The statistical findings, including percentages and rates, discussed in these findings are all statistically significant and subject to 95% confidence intervals.

[18] *See, e.g., Principles of the Law:* Policing § 5 (Am. Law. Inst., Revised Tentative Draft No. 1 2017)*, available at* https://www.ali.org/media/filer_public/f2/80/f2804962-6431-4535-9649-34c5f872140e/policing-uof-online.pdf.

[19] As of July 1, 2021, 18.9% of the population in Minneapolis was Black. This estimate does not account for any Minneapolis resident who is Black *and* one or more additional races or ethnicities. *See* Quick Facts, Minneapolis, United States Census Bureau, 2021, available at www.census.gov/quickfacts/minneapoliscityminnesota (last visited Apr. 20, 2022).

Despite the overwhelming disproportionality of force used by MPD officers against Black community members, some City and MPD leaders, as well as some MPD officers, claim that disproportionality in policing in Minneapolis is due to factors other than race.

Therefore, to further determine if race is the likely reason that MPD officers use higher rates of force against Black individuals, and to control or account for common justifications for this disproportionality, a comparison of use of force incidents against Black and white individuals in *similar circumstances* was completed. This statistical analysis was also coupled with review of MPD's use of force files and body worn camera footage. To complete this racial disparity analysis, MPD's use of force incidents from January 1, 2010, to December 31, 2020, involving Black and white individuals were compared. To ensure the analysis compared individuals in similar situations, use of force incidents were compared only if MPD officers recorded the same justification for the force (i.e., the individual's recorded behavior, such as whether the individual tensed[20]) and where the same primary offense was recorded (i.e., the alleged crime or event that led to the overall police interaction, or the alleged crime that ultimately occurred).[21] This analysis and review of use of force files and body worn camera footage demonstrate that race is the likely reason that MPD officers use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances.

## MPD officers use higher rates of neck restraints or chokeholds against Black individuals than white individuals in similar circumstances

Prior to June 2020, MPD policy permitted the use of neck restraints,[22] even to render someone unconscious. In June 2020, after an MPD officer murdered George Floyd, the temporary court order requested by the Minnesota Department of Human Rights required MPD to ban the use of neck restraints, without exception.

MPD's data shows that during the time neck restraints were permitted under MPD policy, MPD officers were almost twice as likely to use neck restraints against Black individuals than white individuals who MPD officers recorded as behaving in the same way when interacting with police and whose police interaction stemmed from the same alleged offense or event.

---

[20] MPD officers record that an individual "tensed" if that individual tensed their body in some way. For instance, if an individual tenses their upper body or arms to pull away from officers, MPD officers record that the individual "tensed," or "tensed up."

[21] Analysis of MPD's data in this section compares MPD officers' use of force against Black individuals to MPD officers' use of force against white individuals in similar circumstances from January 1, 2010, to May 24, 2020. MPD has insufficient data related to use of force incidents to make similar comparisons for force used by MPD officers against Latino, Asian, Indigenous, or other people of color.

[22] A neck restraint, commonly referred to by members of the public as a "chokehold," is defined as a "method by which a person applies sufficient pressure to a person to make breathing difficult or impossible, and includes but is not limited to any pressure to the neck, throat, or windpipe that may prevent or hinder breathing, or reduce intake of air. Chokehold also means applying pressure to a person's neck on either side of the windpipe, but not to the windpipe itself, to stop the flow of blood to the brain via the carotid arteries." Minn. Stat. § 609.06, subd. 3(b).

MPD's data demonstrates that between January 1, 2010, and December 31, 2020, MPD officers recorded using neck restraints in 1.4% of use of force incidents involving Black individuals. In contrast, MPD officers recorded using neck restraints in 0.8% of use of force incidents involving white individuals in similar circumstances.



*The scale on this axis has been altered in order to focus on the two data points of interest

Review of MPD officers' body worn camera footage confirms many instances where MPD officers used neck restraints against Black individuals, including Black youth under 18-years-old, when it was objectively unnecessary to use such force.[23]

This analysis, which demonstrates that MPD officers are almost twice as likely to use neck restraints against Black individuals than white individuals in similar circumstances, relies only on use of force incidents involving neck restraints that MPD officers *recorded* between 2010 and 2020.[24] However, as evidenced by review of body worn camera footage capturing use of force incidents, MPD officers failed to report *at least* 6% of the neck restraints they used.[25] Therefore, the racial disparity in MPD officers'

---

[23] During 2016, MPD began to phase in the use of body worn cameras for all MPD officers. By 2017, MPD had equipped all officers with body worn cameras. Therefore, body worn camera footage is available generally only from 2017 onward.

[24] MPD policy requires officers to accurately report use of force. However, as discussed in more detail below, MPD officers are not regularly held accountable when the evidence in the file contradicts their use of force reports.

[25] This assessment is based on a review of a statistically representative sample of MPD's use of force files from 2010 to 2020. Review of body worn camera footage in the use of force files depicted officers utilizing neck restraints, but the incident itself was not coded as a force incident involving a neck restraint in MPD's data systems. The inconsistency between the body worn camera footage in the file and the way in which the force incident was coded is concerning. If MPD

use of neck restraints against Black and white community members may be even greater if all use of force incidents were accurately reported and tracked.

### MPD officers are more likely to use chemical irritants against Black individuals

As was the case with the use of neck restraints, MPD officers are also more likely to use chemical irritants against Black individuals compared to white individuals in similar circumstances. To assess whether MPD's use of chemical irritants[26] against Black and white individuals in similar circumstances reflects racial disparities, incidents in which MPD officers used chemical irritants against Black and white individuals were compared only if MPD officers recorded the same justification for the force (i.e., the individual's recorded behavior, such as whether the individual tensed), and where the same primary offense was recorded (i.e., the alleged crime or event that led to the overall police interaction, or the alleged crime that ultimately occurred).

Therefore, any difference in the type of force MPD officers used against Black and white individuals cannot be due to these factors, and race is the likely reason for this difference.

MPD's data demonstrates that between January 1, 2010, and December 31, 2020, MPD officers recorded using chemical irritants in 25.1% of use of force incidents involving Black individuals. In contrast, MPD officers recorded using chemical irritants in 18.2% of use of force incidents involving white individuals in similar circumstances.

Review of MPD's use of force files and body worn camera footage demonstrates incidents from 2010 to 2020 in which MPD officers sprayed Black individuals with chemical irritants when that level of force was unnecessary and inappropriate.



In use of force incidents, MPD officers are more likely to use chemical irritants against Black individuals than white individuals.

There are multiple instances of officers escalating situations by spraying Black men in the face with mace. For example, in 2012, an MPD officer approached a group of Black men who were standing on the sidewalk and the officer instructed them to leave. According to a police report describing the

---

or the City had conducted a substantive audit of the content of MPD officers' body worn camera footage, they would have learned how often MPD officers were in fact utilizing neck restraints and could have determined whether additional training or policy changes were needed to prevent excessive force and ensure that officers accurately record force.

[26] Chemical irritants include mace and oleoresin capsicum colloquially known as pepper spray or OC spray.

incident, when the men refused to leave because they believed they did not have to do so, the MPD officer immediately sprayed one of the Black men in the face with mace.

In another example, in 2017, body worn camera footage shows that after an MPD officer used mace to disperse a group of Black men on a street corner who were pushing one another, the officer taunted them by saying, "Do you want some more?" The officer then pointed the mace cannister at other Black individuals who were not involved with the group that the officer initially dispersed. During this same incident, the MPD officer did not point the mace cannister at white individuals who were also present and were not involved with the group the officer initially dispersed.

### MPD officers are more likely to use chemical irritants on Black individuals in disorderly conduct and obstruction cases and against Black individuals who tense

> A high-level MPD leader explained that officers often arrest and cite individuals with obstruction or disorderly conduct "for things that could fall under the category, arguably, of pissing off the police."

Disorderly conduct[27] and obstruction of legal process (otherwise known as obstruction)[28] are two citations that are often based upon an officer's subjective belief about an individual's behavior.

MPD officers frequently arrest and cite people of color and Indigenous individuals for these alleged violations. A high-level MPD leader explained that officers often arrest and cite individuals with obstruction or disorderly conduct "for things that could fall under the category, arguably, of pissing off the police." Community members and public defenders also consistently reported that MPD officers commonly issue one of these two citations when officers are annoyed or displeased with a community member's reaction or response to a police officer's presence.

---

[27] Disorderly conduct is a misdemeanor criminal offense where an individual engages in behavior that alarms, angers, or disturbs others, including engaging in fighting, disturbing an assembly, or engages in offensive, obscene, abusive, boisterous or noisy conduct or abusive language tending reasonably to arouse alarm, anger, or resentment in others. Minn. Stat. § 609.72, subd. 1.
[28] Obstruction of legal process (obstruction) can be a misdemeanor, gross misdemeanor, or felony offense, where an individual intentionally obstructs, resists, or interferes with a police officer while the officer is engaged in the performance of official duties. Two of the most common examples of obstruction cases include: (1) resisting an officer (i.e., pulling away while being handcuffed) and (2) using force against an officer (i.e., pushing an officer).

**Where disorderly conduct is the recorded primary offense**, MPD's data demonstrates that MPD officers use chemical irritants in **51.4% of cases involving Black individuals compared to 39.3%** of cases involving white individuals.

In disorderly conduct cases, MPD officers are more likely to use soft tactics against white individuals and chemical irritants against Black individuals



**Where obstruction is the recorded primary offense**, MPD's data shows that MPD officers were almost two times as likely to use chemical irritants against Black individuals than white individuals. And, as with disorderly conduct cases, in obstruction cases, MPD officers are more likely to use soft tactics against white individuals than Black individuals.

In obstruction cases, MPD officers are more likely to use soft tactics against white individuals (59%) than Black individuals (49%).

Use of force against Black individuals

Use of force against white individuals





Meanwhile, Minneapolis Police Department officers are more likely to use chemical irritants against Black individuals (17%) than white individuals (10%).

Use of force against Black individuals

Use of force against white individuals





Similar to the subjective determinations made by officers who issue disorderly conduct and obstruction citations, officers also make subjective determinations about individuals' behavior when they determine that an individual "tensed" during an interaction with police. MPD officers record that an individual "tensed" if that individual tensed their body in some way. For instance, if an individual tenses their upper body or arms to pull away from officers, MPD officers record that the individual "tensed," or "tensed up."

MPD's data shows that MPD officers recorded using chemical irritants in 10.7% of cases in which a Black individual tensed, compared to 7.8% of cases in which a white individual tensed in similar circumstances when interacting with the police. In other words, MPD officers were 1.37 times more likely to use chemical irritants against Black individuals who tense, than white individuals who tense in similar circumstances.

## MPD officers are more likely to use soft tactics on white individuals than Black individuals in similar circumstances

While there are multiple examples of officers quickly resorting to chemical irritant use against Black individuals, in contrast, MPD officers are more likely to use soft tactics against white individuals in similar circumstances. Soft tactics are the lowest level of physical force possible and include tactics such as escort holds[29] and joint manipulation.

MPD's data shows that between January 1, 2010, and December 31, 2020, MPD officers recorded using soft tactics in 40.4% of use of force incidents involving Black individuals and in 46.7% of use of force incidents involving white individuals in similar circumstances.

The data suggests that MPD officers often replace the use of soft tactics with chemical irritants when interacting with Black individuals. In other words, white individuals are more likely to have less aggressive interactions with MPD officers than Black individuals.

## MPD officers are more frequently injured when they use neck restraints against community members and when they use inappropriate levels of force

Use of severe force harms not only community members against whom the force is used, but it also harms the police officers who use such force. In fact, MPD's data demonstrates that MPD officers are more frequently injured when they use a neck restraint against a community member, as opposed to other forms of force. Between January 1, 2010, and December 31, 2020, MPD officers were injured in 20% of cases in which they used neck restraints against community members. In contrast, officers were injured in only 8.6% of cases in which they used soft tactics.

---

[29] Escort holds are temporary holds of the hand, wrist, arm, or shoulder to physically control or direct an individual. *See* MPD Policy & Procedure Manual 5-300 (III)(A).

In addition to officers sustaining injuries more frequently when they use neck restraints, MPD officers are also more frequently injured when they use *any* type of force inappropriately. Review of body camera footage in a statistically representative sample of MPD's use of force files reflects that in cases in which MPD officers use inappropriate force against individuals of all racial backgrounds, officers are injured at a rate of about 10%.

Review of body worn camera footage in these cases consistently shows that officers sustain these injuries *after* using inappropriate levels of force. In contrast, in cases in which officers use force appropriately, the rate of injury to the officer decreases to about 5%. This means that officers are twice as likely to be injured when they use inappropriate levels of force.

> Officers are twice as likely to be injured when they use inappropriate force.

The information and analysis above demonstrate that officers are not only harming more community members of color by using higher levels of force based on race, but they are also unnecessarily placing themselves at higher risk of injury. MPD officers could keep community members *and* themselves safer by using lower levels of force against Black individuals, as they do against white individuals in similar circumstances.

In other words, non-discriminatory policing would result in greater safety for MPD officers. In total, analysis of MPD's use of force data and files demonstrates that race is the likely reason that MPD officers use force differently against Black and white individuals.

# MPD officers are more likely to stop vehicles with people of color and Indigenous individuals when officers are more likely to identify the race/ethnicity of a vehicle's occupants

Traffic stops are one of the most common ways that police officers and community members interact. As with law enforcement entities across the country, traffic stops are one of MPD's most frequent enforcement activities.

Community members reported being racially profiled by MPD officers during traffic stops. Community members of color reported that they are often pulled over by MPD officers for minor offenses such as having a broken or dim license plate light or moving to the curb to park without using signals. They shared that when they were stopped for either a moving violation or no genuine reason at all, MPD officers asked if they had guns or drugs in the car. In contrast, several white community members reported that when MPD officers pulled them over for moving violations, the officers never asked them if they had guns or drugs in their vehicles. Community members of color stated that officers who conducted these stops sometimes immediately began searching vehicles for drugs and weapons, even without legal justification to initiate a search. Public defenders also reported numerous cases they were involved in where MPD officers claimed to smell marijuana in vehicles with Black individuals to allegedly justify searching a vehicle, but officers then found no evidence of drugs.

Between 2017 and 2020, MPD officers stopped 72,689 individuals across all five of MPD's precincts. Although Black individuals comprise nearly 19% of the Minneapolis population, 54% of MPD officer-initiated traffic stops involved Black individuals during this time period. And while white individuals comprise nearly 63% of the Minneapolis population, 33% of MPD officer-initiated traffic stops involved white individuals during this same time period.[30] As with MPD officers' use of force, to determine whether race is the likely reason for racial disparities in traffic stops, further statistical analysis was completed.

Analysis of MPD's traffic stop data[31] demonstrates that when MPD officers are more likely to see the race of a vehicle's occupants, officers are more likely to stop vehicles with people of color or Indigenous individuals than vehicles with only white occupants. In other words, race is the likely reason for the racial disparity in MPD's traffic stop practices.

---

[30] *See* Quick Facts, Minneapolis, United States Census Bureau, 2021, available at census.gov/quickfacts/minneapoliscityminnesota (last visited Apr. 20, 2022).

[31] Because MPD only began uniformly recording the race of individuals during traffic stops in 2017, these findings are derived from MPD's data between January 2017 to May 2020.

To make this finding, MPD's officer-initiated traffic stops were analyzed using the well-established veil of darkness (VoD) method.[32] The VoD method analyzes whether there is a difference in police traffic stop patterns that occur immediately before sunset – when it is light outside and officers are more likely to see the race of a vehicle's occupants – compared to police traffic stop patterns that occur immediately after sunset – when it is dark outside and officers are unlikely to see the race of a vehicle's individuals before stopping the vehicle.[33]

The VoD method is a statistically conservative analysis and, in jurisdictions where the analysis has been performed, race disparities are not commonly found.[34] Unlike those jurisdictions, in Minneapolis, the VoD analysis shows race disparities in traffic stops by MPD.

MPD officers were 12% more likely to stop a vehicle occupied by a person of color or Indigenous individual when it was light outside and officers were more likely to see the race of the people in the car, compared to when it was dark outside and officers were less likely to identify the race of individuals before deciding to make a stop.

> This racial disparity in traffic stops exists across Minneapolis and is not the result of traffic enforcement practices in a single precinct.

In other words, MPD's data reflects that people of color and Indigenous people are more likely to be stopped by MPD officers when their race is visible than when it is dark outside, and their race is less visible. This racial disparity in traffic stops exists across Minneapolis and is not the result of traffic enforcement practices in a single precinct.

---

[32] Jeffrey Grogger & Greg Ridgeway, *Testing for Racial Profiling in Traffic Stops From Behind the Veil of Darkness*, 101 J. of the Am. Stat. Ass'n. 878, 878-79 (2006), available at www.rand.org/content/dam/rand/pubs/reprints/2007/RAND_RP1253.pdf (last visited Apr. 20, 2022).

[33] The VoD method does not require police to be race-blind at night or race to be completely revealed for all stops during the day. The VoD method only requires that it is more difficult to identify the race of the driver in advance when the stop occurs after dark. Because the race distribution of drivers on the road can vary by hour of the day, this analysis uses the abrupt changes to and from Daylight Saving Time for the comparison. For example, on the Monday in November before Daylight Savings Time ends in Minneapolis it is light out at 6pm, but the following Monday it is dark out at 6pm. Comparing the race distribution at the same times on the same days of the week across the change to and from Daylight Saving Time accounts for the possibility that the race of drivers on the road might differ by day of week and time of day. This analysis uses data from traffic stops made between January 2017 to May 2020, but only those days within 56 days of a change to or from Daylight Saving Time. All the traffic stops used in the analysis occurred between 17:06 and 20:58, or the evening time frame during which in Minneapolis it can sometimes be light and sometimes be dark. In 6,519 of the stops, the vehicle was occupied by a person of color or Indigenous individual, and in 3,162 of the stops, drivers and passengers were all white.

[34] Racial disparities were not found in Connecticut, Rhode Island, and California when the VoD method was used to analyze traffic stop data in those states. *See* State of Connecticut, Traffic Stop Data Analysis and Findings, 2018 available at https://assets.website-files.com/6076e3f57e39855392637f16/608969ac86055d0bd5d5e680_2018-Connecticut-Racial-Profiling-Report.pdf (last visited Apr. 20, 2022);
State of Rhode Island, Traffic Stop Data Analysis and Findings, 2019 (Feb. 2021) available at www.dot.ri.gov/Safety/docs/CCPRA/2019_Rhode_Island_Traffic_Stop_Study.pdf (last visited Apr. 20, 2022);  State of California, Racial Identity Profiling Advisory Board, Annual Report 2021, available at https://oag.ca.gov/sites/all/files/agweb/pdfs/ripa/ripa-board-report-2021.pdf (last visited Apr. 20, 2022).

Furthermore, current and former high-level City officials, MPD supervisors, and patrol officers admitted that MPD stops vehicles with people of color for either no genuine reason or for low-level violations in an effort to find guns or drugs in cars operated by people of color.

MPD's data records, however, do not allow for an accurate analysis to determine the likelihood that contraband is found based on the race of a vehicle's occupants. In 20-30% of officer-initiated traffic stops where a gun or drugs were recovered, no search is recorded in MPD's electronic data systems. This means that MPD officers do not electronically record all of their searches in a manner that allows for an analysis to determine the likelihood that unlawful guns or drugs are found based on the race of a vehicle's occupants.

In other jurisdictions that maintain their data in a manner that allows for this type of analysis, investigations have repeatedly shown that weapons and drugs are found at lower rates in vehicles with people of color compared to white people. Findings from other jurisdictions either show that officers' suspicion of criminal wrongdoing are less likely to be accurate when interacting with Black individuals or that officers are more likely to search Black individuals without any suspicion of wrongdoing. Similarly, several MPD officers and high-level officials simply assume that people of color are more likely to have weapons and drugs in their vehicles.

A high-level MPD official stated that they are aware that MPD's practice of traffic enforcement has led to racial disparities with respect to whom is stopped. One patrol officer claimed that they did not engage in racial profiling, yet later in the interview provided an example of how they might solve a crime based on racial stereotypes. This officer did not appear to understand that searching for someone based solely on racial stereotypes was, in fact, racial profiling.

## MPD officers treat Black and white individuals differently during traffic stops

As with MPD's use of force data, MPD's post-stop traffic enforcement data also reflects significant racial disparities with respect to how MPD officers treat Black and white individuals during traffic stops. During traffic stops, MPD officers search, cite, use force against, and arrest Black individuals at a rate that is significantly disproportionate to the size of the Black population in Minneapolis.

To control or account for certain justifications for this disproportionality other than race, a comparison of traffic stops made by MPD officers between January 1, 2017, and May 24, 2020,[35] of Black and white individuals *in similar circumstances* was completed. Traffic stops were compared only if MPD officers made the stops for the same recorded reason,[36] in the same place, and during the same year, month, day of the week, and time of day. Because this analysis controls for the recorded basis for the stop as well as the time and place of the stop, any difference in the post-stop outcome between Black and white individuals cannot be due to these factors. In total, all traffic stops involving at least one Black individual were compared to traffic stops of only white individuals in similar circumstances.

As detailed below, statistical analysis and review of additional qualitative evidence in the record, demonstrates that race is the likely reason that MPD officers search, cite, use force against, and arrest Black individuals disproportionately during traffic stops.

### MPD officers are more likely to search Black individuals and/or their vehicles during a traffic stop than white individuals in similar circumstances

MPD officers search Black individuals or their vehicles during a traffic stop at a rate that is significantly disproportionate to the size of the Black population in Minneapolis. Although Black individuals comprise approximately 19% of the Minneapolis population, MPD's data shows that from January 1, 2017, to May 24, 2020, 78% – or over 6,500 – of all searches conducted by MPD officers were searches of Black individuals or their vehicles during officer-initiated traffic stops in MPD's five precincts.[37]

---

[35] As noted above, because MPD only began uniformly recording the race of individuals during traffic stops in 2017, these findings are derived from MPD's data between January 2017 to May 2020.

[36] When recording the reason for a stop, MPD officers can select: citizen/911, equipment violation, investigative, moving violation, or NA. MPD's data systems do not contain additional information for the reason for a stop or search.

[37] Traffic stops that result in a search of an individual *and* a vehicle are counted as only one search in this data analysis. This data analysis does not include searches completed by MPD officers who search an impounded vehicle pursuant to a search warrant. In addition, a high-level MPD official explained that officers inconsistently record whether they completed a search if the contraband in the vehicle was in plain view or clearly visible to the officer.

Despite the substantial disproportionality of searches MPD officers complete of Black individuals and their vehicles during a traffic stop, some City and MPD leaders, as well as some MPD officers, claim that this disproportionality is due to factors other than race.

Thus, to further assess if race is the likely reason that MPD officers search Black individuals or their vehicles disproportionately, and to control or account for common justifications for this disproportionality, a comparison of searches of Black and white individuals or their vehicles *in similar circumstances* was completed.

To complete this racial disparity analysis, traffic stops that MPD officers made from January 1, 2017, to May 24, 2020, were compared. To ensure the analysis compared individuals in similar situations, traffic stops were compared only if MPD officers made the stops for the same recorded reason, in the same location, in the same month and year, and at the same time of day. This analysis shows that MPD officers searched 16.1% of Black individuals or their vehicles during a traffic stop and searched 8.8% of white individuals or their vehicles. Even when comparing only similar traffic stops, MPD officers searched Black individuals or their vehicles during a traffic stop almost twice as often compared to white individuals and their vehicles. In other words, MPD officers treat Black and white individuals differently during traffic stops. This analysis, coupled with other qualitative evidence in the record, demonstrates that race is the likely reason that MPD officers search Black individuals or their vehicles at higher rates than white individuals in similar circumstances.

### Evidence of racial disparities in searches during traffic stops



Black individuals comprise 19% of the population yet make up 78% of all searches conducted during traffic stops.



When comparing Black and white individuals in similar circumstances, MPD officers are almost two times as likely to search Black individuals or their vehicles.

This racial disparity persists across MPD's five precincts. In every precinct in Minneapolis, MPD officers are between 1.6 to 2.5 times as likely to search Black individuals or their vehicles compared to vehicles with only white individuals who are stopped under similar circumstances.

As noted above, because the analysis of MPD's officer-initiated traffic stop search data controls for several data points MPD officers document, including the recorded basis for the stop as well as the time and place of the stop, any difference in the post-stop outcome between Black and white individuals cannot be due to these factors.

Statements from community members in Minneapolis reflect the statistical evidence showing that MPD officers are more likely to search Black individuals and/or their vehicles based on race. For instance, one Black man reported that MPD officers pulled him over at least seven times in the last five years for alleged minor traffic violations. During four of those stops the officers told him that they smelled marijuana in his vehicle and conducted a search while they handcuffed him, sometimes with their guns drawn and pointing at him. However, officers never found any drugs in his vehicle. Other community members of color shared similar statements describing incidents in which MPD officers searched them for no apparent reason, other than their race.

In sum, MPD's data and additional qualitative evidence in the record demonstrate that race is the likely reason that MPD officers disproportionately search Black individuals during traffic stops.

## MPD officers are more likely to cite Black individuals during a traffic stop than white individuals in similar circumstances

MPD officers issue citations to Black individuals during a traffic stop at a rate that is significantly disproportionate to the size of the Black population in Minneapolis. Although Black individuals comprise approximately 19% of the Minneapolis population, MPD's data demonstrates that from January 1, 2017, to May 24, 2020, 55% – or over 10,000 – of all citations MPD officers issued to individuals during traffic stops were issued to Black individuals.

As with searches, despite the overwhelming disproportionality of citations MPD officers issue to Black individuals during traffic stops, some City and MPD leaders, as well as some MPD officers, claim that any disproportionality in policing is due to factors other than race.

Therefore, to further determine if race is the likely reason that MPD officers cite Black individuals disproportionately, and to control or account for common justifications for this disproportionality, a comparison of traffic stops involving Black and white individuals *in similar circumstances* was completed.

### Evidence of racial disparities in citations during traffic stops



Black individuals comprise 19% of the population yet make up 55% of all citations issued to individuals during traffic stops.



When comparing Black and white individuals in similar circumstances, MPD officers are nearly 1.5 times more likely to issue a citation to Black individuals.

To complete this racial disparity analysis, traffic stops that MPD officers made from January 1, 2017, to May 24, 2020, were compared only if the stops were made for the same recorded reason, in the same location, in the same month and year, and at the same time of day. This analysis shows that MPD officers cited 26.5% of Black individuals during a traffic stop and cited 17.8% of white individuals during similar traffic stops. This means that MPD officers were nearly 1.5 times more likely to issue a citation to Black individuals compared to white individuals in similar circumstances. Based on MPD's electronic records, MPD officers issue citations to Black and white individuals differently.

MPD's precinct-level data also demonstrates that MPD officers issued citations at higher rates to Black individuals compared to white individuals in four of MPD's five precincts.[38] This means that the racially disparate way MPD officers cite individuals during traffic stops exists *across* Minneapolis and is not the result of traffic enforcement practices in a single precinct.

> The racially disparate way MPD officers cite individuals during traffic stops exists *across* Minneapolis.

---

[38] Precinct-level analysis demonstrates that MPD officers issue citations at higher rates to Black individuals compared to white individuals in similar circumstances in all five precincts – that finding is statistically significant in four of the five precincts.

Like the analysis of MPD officers' search practices, this analysis controls for several data points MPD officers document, including the recorded basis for the stop as well as the time and place of the stop. Therefore, any difference in citations issued to Black and white individuals cannot be due to these factors and race is the likely reason for the disparities in MPD's citation data.

## MPD officers are more likely to stop Black individuals for longer during a traffic stop than white individuals

When police officers make a traffic stop, state and federal law require that the stop last no longer than is necessary to effectuate the purpose of the stop.[39] Typically, when MPD officers make traffic stops, the stop lasts less than 15 minutes. In fact, from 2017 to 2020, 79% of all MPD officer-initiated traffic stops lasted less than 15 minutes. While this data point reflects that traffic stops made by MPD officers typically last less than 15 minutes, MPD's data also shows that officers treat Black and white individuals differently when it comes to the length of traffic stops.

Specifically, MPD's data demonstrates that MPD officers are more likely to stop Black individuals for longer than 15 minutes when compared to white individuals. In 25.5% of traffic stops involving Black individuals, MPD officers stopped vehicle occupants for more than 15 minutes. In contrast, MPD officers stopped vehicle occupants for longer than 15 minutes in 17.3% of traffic stops involving only white individuals.

> MPD officers were 1.5 times more likely to stop vehicles with Black individuals for longer than vehicles with only white individuals.

In other words, MPD officers were 1.5 times more likely to stop vehicles with Black individuals for longer than vehicles with only white individuals across Minneapolis.

## MPD officers are more likely to use force against Black individuals during a traffic stop than white individuals in similar circumstances

During a traffic stop, MPD officers may use force against the occupants of a vehicle if the force is necessary, proportional, objectively reasonable, and consistent with the affirmative duty to de-escalate. From January 1, 2017, to May 24, 2020, MPD officers recorded using force against

---

[39] *State v. Weigand*, 645 N.W.2d 125, 136 (Minn. 2002) (explaining that the Minnesota Constitution imposes a reasonableness limitation on both the scope and duration of a *Terry* stop and requires that officers act diligently and reasonably to justify extending an initial stop); *see also Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (holding that the United States Constitution prevents police from routinely extending an otherwise-completed traffic stop, absent reasonable suspicion of criminal activity).

approximately 70 Black individuals during traffic stops.[40] This means that of the officer-initiated traffic stops in which MPD officers recorded using force, 80% of those stops involved Black individuals even though Black individuals only comprise approximately 19% of the Minneapolis population.

While the disproportionate way in which MPD officers use force against Black individuals during traffic stops is significant, some City and MPD leaders, as well as some MPD officers, claim that disproportionalities in policing in Minneapolis are due to factors other than race. Therefore, to further determine if race is the likely reason that MPD officers use more force against Black individuals during traffic stops, and to control or account for common justifications for this disproportionality, a comparison of traffic stops of Black and white individuals *in similar circumstances* was completed.

Comparing traffic stops that MPD officers made in the first and fifth precincts from January 1, 2017, to May 24, 2020, for the same recorded reason, in the same location, in the same month and year, and at the same time of day shows that MPD officers were more likely to use some type of force against Black individuals than during traffic stops of vehicles occupied by only white individuals.

In fact, in the first precinct, which serves downtown Minneapolis, when MPD officers stopped vehicles with Black individuals, officers were six times more likely to use some type of force against the vehicle's occupants than during traffic stops of vehicles occupied by only white individuals who were stopped in similar circumstances.

Like the analyses discussed above, because this analysis controls for several data points MPD officers document, including the recorded basis for the stop as well as the time and place of the stop, any difference in force used against Black and white individuals during traffic stops cannot be due to these factors. Therefore, race is the likely reason for the racially disparate way in which MPD officers use force during traffic stops.

## MPD officers are more likely to arrest Black individuals during traffic stops than white individuals in similar circumstances

Similar to the disproportionate way in which MPD officers search, cite, and use force against Black individuals during traffic stops, MPD officers also disproportionally arrest Black individuals during traffic stops. Although Black individuals comprise approximately 19% of the Minneapolis population, MPD's data shows that from January 1, 2017, to May 24, 2020, 71% – or over 2,500 – of all arrests MPD officers made during traffic stops were arrests of Black individuals.

---

[40] In contrast, MPD officers recorded using force against approximately 10 white individuals during officer-initiated traffic stops from January 1, 2017, to May 24, 2020.

As with the analyses above, to further determine if race is the likely reason that MPD officers disproportionately arrest Black individuals during traffic stops, and to control or account for common justifications for this disproportionality, a comparison of traffic stops involving Black and white individuals *in similar circumstances* was completed.



Evidence of racial disparities in arrests during traffic stops





This statistical analysis of MPD's data, coupled with additional qualitative evidence in the record, demonstrates that race is the likely reason that officers are more likely to arrest Black individuals during traffic stops compared to white individuals. Comparing traffic stops that MPD officers made from January 1, 2017, to May 24, 2020, shows that MPD officers arrested 6.6% of Black individuals during a traffic stop and 4.6% of white individuals who were stopped for the same recorded reason, in the same location, in the same month and year, and at the same time of day. Therefore, MPD officers were 1.4 times more likely to arrest a Black individual during a traffic stop than a white individual who was stopped under similar circumstances.

As with the other post-stop racial disparities discussed above, the racial disparity with respect to arrests during a traffic stop also persists across MPD's precincts. In every precinct, MPD officers were between 1.3 times to 2.1 times more likely to arrest a Black individual during a traffic stop than a white individual who was stopped for the same recorded reason, in the same location, in the same month and year, and at the same time of day. This means that racial disparities in who MPD officers arrest during traffic stops cannot be the result of arrest practices in a single precinct.

> In every precinct, MPD officers were between 1.3 times and 2.1 times more likely to arrest a Black individual than a white individual during similar traffic stops. This means that racial disparities in who MPD officers arrest during traffic stops cannot be blamed on only one precinct.

As with the analyses discussed above, because this analysis controls for several data points MPD officers document, including the recorded basis for the stop as well as the time and place of the stop, any difference in arrests of Black and white individuals during traffic stops cannot be due to these factors. Therefore, race is the likely reason for the racially disparate way in which MPD officers arrest individuals during traffic stops.

## MPD officers improperly and excessively cite Black individuals with disorderly conduct and obstruction resulting in collateral consequences

Outside of traffic stops, MPD's data further demonstrates that MPD officers improperly and excessively cite Black individuals with specific offenses. Community members and public defenders consistently reported that MPD officers commonly issue citations for disorderly conduct and/or obstruction of legal process (obstruction) when officers are annoyed with or displeased with a community member's reaction or response to a police officer's presence. As explained above, disorderly conduct and obstruction are also two of the citations that often depend on an officer's subjective belief about an individual's behavior. Many individuals reported that officers frequently arrested and cited people of color for these alleged violations. Analysis of cases involving citations for disorderly conduct and/or obstruction show that MPD officers improperly and excessively cite Black individuals for these offenses. The collateral consequences of these unjustified citations are significant.

### MPD officers improperly and excessively cite Black individuals

An individual may be charged with disorderly conduct, a misdemeanor criminal offense, if they engage in behavior that alarms, angers, or disturbs others. This includes engaging in fighting, disturbing an assembly, or engaging in offensive, obscene, abusive, boisterous, or noisy conduct or abusive language tending reasonably to arouse alarm, anger, or resentment in others.[41]

An individual may be charged with obstruction of legal process (obstruction), which is a misdemeanor, gross misdemeanor, or felony offense, if they intentionally obstruct, resist, or interfere with a police officer while the officer is engaged in the performance of official duties.[42] Generally, two types of cases fall within obstruction: (1) resisting an officer (i.e., pulling away while being handcuffed) and (2) using force against an officer (i.e., pushing an officer). If an individual is improperly apprehended but resists arrest, they can be charged with obstruction without an underlying offense.

From 2010 to 2020, MPD officers cited over 3,300 Black individuals for disorderly conduct or obstruction – or approximately 66% of all disorderly conduct and obstruction citations issued by MPD officers.

---

[41] Minn. Stat. § 609.72, subd. 1.
[42] Minn. Stat. § 609.50, subd. 1.

Analysis of closed disorderly conduct and/or obstruction cases[43] shows that MPD officers apply a different standard to Black and white arrestees when issuing disorderly conduct and obstruction citations.[44] Prosecution data of disorderly conduct and obstruction cases demonstrates that Black individuals are more likely to have their cases dropped, dismissed, or found not guilty by a judge or jury compared to white individuals cited with the same offenses by MPD officers.

Specifically, of the cases in which Black individuals were cited by MPD officers for disorderly conduct or obstruction, 18.9% were ultimately dropped, dismissed, or the individual was found not guilty. In contrast, of the cases in which white individuals were cited by MPD officers for disorderly conduct or obstruction, 15.5% were ultimately dropped, dismissed, or the individual was found not guilty.

This means that many of the disorderly conduct and obstruction citations that MPD officers issued to Black individuals were likely unjustified because there was insufficient evidence to pursue prosecution, or there was no probable cause.

The prosecution data also demonstrates that white individuals were also more likely to receive leniency through some type of continued supervision, such as treatment court, a continuance without prosecution,[45] or a diversion program. Specifically, of the cases in which MPD officers cited white individuals for obstruction, 21% of cases resulted in some form of leniency, as opposed to 16.5% of similar cases involving Black individuals. This means that not only are obstruction citations that MPD officers issue to white individuals more likely justified, but white individuals are treated more leniently in the criminal justice system.

---

[43] The City disclosed data from 2010 to 2020 on 4,137 closed disorderly conduct cases and 1,731 closed obstruction of legal process cases where the cases had been declined by the prosecutor or completely adjudicated by the court. Each case was coded based on whether: (1) the defendant had been found guilty (found guilty by the court or by a jury, pleaded guilty either to the charge, a lesser charge, or amended charge, pleaded guilty in a merged case) or had their charges upgraded to a felony; (2) if the charges had been dismissed due to prosecutorial discretion, insufficient evidence, or a finding of no probable cause or were found not guilty by a jury or court; and (3) if the charges were dismissed but for reasons that do not necessarily signal an issue with the quality of the arrest, such as a Rule 20 dismissal, which allows for dismissal where a defendant is not cognitively able to participate in court proceedings. 13% of the cases were excluded entirely from the analysis because they lacked information on the race of the defendant.

[44] MPD's recorded data does not allow for analysis as to whether the same underlying behavior of an individual may result in a racially disparate outcome with respect to whether MPD cites the individual with a disorderly charge or obstruction charge. This is because detailed information about a subject's behavior that reportedly justified the charge is not collected in a field in MPD's data coding systems, but is rather only maintained in individual charge forms that would have to be individually reviewed for each case to determine what, if any behavior, was recorded to justify the citation.

[45] A continuance without prosecution means that the prosecutor agrees to suspend the prosecution of the charges against a defendant for a period of time. Typically, if the defendant does not commit the same or similar type of offense, the charges are dismissed at the end of the period of time. *See* Minn. R. Crim. P. 27.05.

## Collateral consequences of unjustified citations to Black individuals

Black community members describe the price of being Black when interacting with MPD as the "Black Tax," – sometimes literally, by way of citation fines. Even when citations are dropped or dismissed, or individuals are found not guilty, the consequences of these unjustified citations remain significant.[46]

The short and long-term consequences of a criminal charge or citation and/or a corresponding arrest can be substantial, and at times, devastating.[47] Individuals who are wrongly cited and/or arrested must spend time and resources to challenge the procedural injustice.[48] They may need to obtain and pay for an attorney to challenge the improper citation. Some individuals may need to take out loans to afford legal counsel and related legal fees.[49] Individuals often need to take time off work, and as a result may lose their job, particularly if they have hourly or low-paying jobs that do not allow for time off.[50]

Others may need to decide between paying for legal counsel or other necessities, such as purchasing food or paying for housing. For example, one Black community member reported that she lost her housing because she had to decide between paying her rent or paying her attorney to challenge a wrongful citation that she received from an MPD officer in 2019. The charge was ultimately dismissed, but as of 2021, this community member was still experiencing homelessness and living in her car. She said, "I honestly do feel like I was stereotyped, I do. . . It is something that I don't think a white

> One Black community member reported that she lost her housing because she had to decide between paying her rent or paying her attorney to challenge a wrongful citation. The charge was ultimately dismissed, but as of 2021, she was still living out of her car.

---

[46] AM. BAR ASS'N, COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTIONS: A JUDICIAL BENCH BOOK 4–7 (2018) (detailing consequences of convictions for individuals that include loss of and difficulty obtaining housing, employment, loans, public assistance, and more). ojp.gov/pdffiles1/nij/grants/251583.pdf (last visited Apr. 20, 2022); Eisha Jain, *Arrests as Regulation*, 67 STAN. L. REV. 809, 811–15 (2015) (describing impact of arrests on housing, employment, licensing, child protective services involvement, and immigration); Shawn D. Stuckey, *Collateral Effects of an Arrest in Minnesota*, 5 U. ST. THOMAS L.J. 335, 344–48 (2008) (detailing stigmatizing effects of collateral consequences in Minnesota).

[47] Under Minnesota state law, individuals can submit a written request to expunge their record of an arrest or a charge. However, the law limits expungement to specific situations. *See* Minn. Stat. § 299C.11 subd. 1(b) (detailing the process and limitations of expunging arrests from a criminal record); Minn. Stat. § 609A.03 (detailing a more burdensome process when an individual seeks to expunge arrests that do not qualify for the process provided by § 299C.11).

[48] Issa Kohler-Hausmann, *Misdemeanor Justice: Control Without Conviction*, 119 AM. J. OF SOC. 351, 375 (2013) (detailing the procedural costs to defendants in misdemeanor trials, which include obtaining childcare, missing work or school, and the psychological impact of being shuffled through the system).

[49] ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 484 (2018) available at americanbar.org/content/dam/aba/administrative/professional_responsibility/aba_formal_opinion_484.pdf (Last visited Apr. 20, 2022) (discussing attorney's obligations to charge reasonable fees and be conscientious of individuals who are required to take out financing to pay for legal representation in criminal cases).

[50] Christopher Uggen & Robert Stewart, *Piling On: Collateral Consequences and Community Supervision*, 99 MINN. L. REV 1872, 1875 (2015) (employers suspend workers without pay due to arrests or charges, regardless of conviction).

person will ever understand in a lifetime unless [they] reincarnate and come back Black. Then [they] would understand."

Even after spending the time and resources needed to have a charge dropped or dismissed or to be found not guilty, some individuals may nonetheless continue to have an improper arrest or citation on their record.[51] A record with a citation or arrest could impact child custody or immigration status. It could also prevent an individual from obtaining future employment, housing, or additional education.[52] Thus, as a result of an improper citation issued by MPD officers, the employment, housing, or family situation of Black individuals may be negatively impacted.[53] Furthermore, youth of color who enter the criminal justice system due to an unjustified arrest or citation may also suffer long-term consequences.[54] In short, lives can be unjustly upended because of discriminatory policing.

> While criminal citations can be important tools for advancing public safety, MPD officers use these tools in a discriminatory and punitive way – unjustifiably citing Black individuals at a higher rate than they cite white individuals.

While criminal citations can be important tools for advancing public safety, MPD officers use these tools in a discriminatory and punitive way – unjustifiably citing Black individuals at a higher rate than they cite white individuals. These racial disparities further support a finding that MPD engages in a pattern or practice of race discrimination.

---

[51] NAT'L ASS'N OF CRIMINAL DEFENSE LAWYERS, COLLATERAL DAMAGE: AMERICA'S FAILURE TO FORGIVE OR FORGET IN THE WAR ON CRIME 22 (2014) available at nacdl.org/getattachment/4a1f16cd-ec82-44f1-a093-798ee1cd7ba3/collateral-damage-america-s-failure-to-forgive-or-forget-in-the-war-on-crime-a-roadmap-to-restore-rights-and-status-after-arrest-or-conviction.pdf, (last visited Apr. 20, 2022) (explaining that electronic criminal record databases make it more difficult to erase improper arrests or citations from one's history).

[52] Kristin Turney & Sara Wakefield, *Criminal Justice Contact and Inequality*, 5 RSF: THE RUSSELL SAGE FOUND. J. OF SOC. SCIS. 1, 8 (2019) (summarizing study finding that individuals reporting an arrest on a job application received fewer callbacks); Eisha Jain, *Arrests as Regulation*, 67 STAN. L. REV. 809, 833–38 (2015) (detailing how public housing authorities and private landlords use arrests and citations to evict or deny housing to people).

[53] Benjamin D. Geffen, *The Collateral Consequences of Acquittal: Employment Discrimination on the Basis of Arrests Without Convictions*, 20 U. PA. J.L. & SOC. CHANGE 81 (2017) (discussing impact of acquittals and arrests without convictions on employment prospects); Shawn D. Stuckey, *Collateral Effects of an Arrest in Minnesota*, 5 U. ST. THOMAS L.J. 335, 347–48 (2008) (discussing impacts of an arrest in housing and employment); Elizabeth Brown, *Barriers Facing Parents with Criminal Records in Child Protective Proceedings*, in CTR. FOR ADVANCED STUDIES IN CHILD WELFARE, UNIV. OF MINN. SCH. OF SOC. WORK, CW360: CRIMINAL JUSTICE INVOLVEMENT OF FAMILIES IN CHILD WELFARE 25 (2018) available at cascw.umn.edu/wp-content/uploads/2018/04/CW360_Spring2018_WebTemp.pdf, (last visited Apr. 20, 2022) (outlining bias and prejudice parents with criminal records face in the child welfare system).

[54] *See, e.g.*, Anne McGlynn-Wright, et. al., *The Usual, Racialized Suspects: The Consequences of Police Contacts with Black and White Youth on Adult Arrest*, 2020 Social Problems 1, 12 (finding that police contact by age 14 increases likelihood of arrest for Black youth, but not for white youth); Edgar S. Cahn, Joint Ctr. for Pol. & Econ. Studies, *How the Juvenile Justice System Reduces Life Options of Minority Youth*, 4 (2006) available at prisonlegalnews.org/media/publications/juvenile%20justice%20system%20effects%20on%20minority%20youth-health%20policy%20institute.pdf (last visited Apr. 20, 2022) (detailing legal, social, and economic collateral consequences for youth of color involved in the criminal justice system).

## MPD uses covert social media to target Black leaders, Black organizations, and elected officials without a public safety objective

Law enforcement agencies may have legitimate reasons to track social media activity. And police departments may specifically have a reason to use covert social media if a clear investigative purpose to advance public safety exists. Police departments that use covert social media must have clear procedures and accountability mechanisms in place to ensure that covert social media use has a close nexus to a true public safety objective.

A review of MPD's covert social media accounts from January 2010, through December 2020, demonstrates that MPD officers used covert, or fake, social media accounts to surveil and engage Black individuals, Black organizations, and elected officials unrelated to criminal activity, without a public safety objective. In contrast, MPD officers did not similarly track and surveil white people unrelated to criminal activity using MPD covert social media accounts. In fact, as of December 2020, MPD did not operate its own covert social media accounts to track white supremacist or white nationalist groups.

MPD officers using MPD covert social media to target and surveil Black community members demonstrates a pattern or practice of discriminatory, race-based policing.[55]

### MPD's covert social media accounts were used to conduct surveillance, unrelated to criminal activity, and to falsely engage with Black individuals, Black leaders, and Black organizations

MPD officers used MPD covert accounts, unrelated to any actual or alleged criminal activity, to seek and gain access to Black individuals' social media profiles, as well as social media profiles of Black groups and organizations, such as the NAACP and Urban League. Specifically, MPD officers sent friend requests, commented on posts, sent private messages, and contributed to discussions. When doing so, officers posed as like-minded individuals and claimed, for example, that they met the targeted person at a prior demonstration or protest. In social media posts and messages, MPD officers used language to further racial stereotypes associated with Black people, especially Black women.

In one case, an MPD officer used an MPD covert account to pose as a Black community member to send a message to a local branch of the NAACP criticizing the group. In another case, an MPD officer posed as a community member and RSVP'd to attend the birthday party of a prominent Black civil rights lawyer and activist.

---

[55] The specific covert social media accounts analyzed for this investigation were deleted in the winter of 2021.

> In one case, an MPD officer used an MPD covert account to pose as a Black community member to send a message to a local branch of the NAACP criticizing the group.

While MPD officers also use MPD covert social media to investigate criminal activity, engaging with community members in a false way is improper when there is no nexus to a criminal investigation or to a public safety objective. Community members continue to request authentic engagement with MPD. However, MPD's covert social media use in the instances described above undermines community trust and negates relationship building between MPD and the public.

## MPD officers used covert accounts to pose as community members to criticize elected officials

MPD officers also used MPD's covert accounts to pose as community members in order to post comments and content online attacking police critics and criticizing local officials.

In addition, MPD officers used MPD's covert accounts to send private messages criticizing elected officials, while posing as community members. These elected officials included a Minneapolis City Council Member and a State elected official.

Police officers using MPD's covert social media to contact and criticize elected officials is an inappropriate use of official City resources. This inappropriate covert activity can also undermine the democratic process because false communications can distort elected officials' perspectives and understanding of positions taken by community members. Police officers, as noted above, can use covert social media for a clear investigative purpose to advance public safety. And police officers certainly have the right to engage in the political process, but they must do so authentically, as themselves.

## MPD does not have proper oversight and accountability mechanisms for officers' covert social media use

Since at least 2013, MPD has maintained a policy outlining its use of covert social media accounts for the purpose of investigating criminal activity on social networking sites, like Facebook, Twitter, Instagram, and others.[56] If a clear investigative purpose to advance public safety exists, MPD, like many other law enforcement agencies, may create and use covert or fake social media accounts to gather

---

[56] On September 20, 2021, the MPD's Policy and Procedure Manual was revised, moving requirements for the use of covert social media accounts to MPD Policy 7-119(IV)(C). The only substantive change to the policy was a requirement of an annual "audit[] to ensure that the covert profiles are still active."

evidence and investigate suspected criminal activity. MPD's policy[57] requires a supervisor to approve the creation of a covert social media account. The following information must be registered with the Commander of MPD's Strategic Information Center: the name and web address of the social media site, the username and screen name of the covert social media profile, and the name of the MPD employee responsible for maintaining the covert account.

While officers must provide this information to the Commander of the Strategic Information Center, MPD's oversight of officers' covert social media is insufficient and ineffective. First, MPD does not maintain an accurate inventory of the covert accounts operated by MPD officers. Specifically, MPD's inventory of covert accounts did not include at least two dozen additional covert accounts operated by MPD officers. Furthermore, as of April 2022, MPD still did not have a policy in its Policy and Procedure Manual requiring MPD leaders to substantively review officers' covert social media activity to ensure that covert accounts are being used for legitimate investigative purposes, and not, for instance, to send messages to City Council Members criticizing them.

> As of April 2022, MPD still did not have a policy requiring a substantive audit of officers' covert social media activity.

In September 2021, MPD amended its covert social media policy to require the Commander of the Strategic Information Center or their designee to conduct yearly audits only to ensure that the covert accounts are still active. However, MPD still does not have a policy requiring a substantive audit of officers' covert social media activity. As a result, MPD officers continue to operate covert accounts without sufficient supervision, oversight, or accountability.

MPD must immediately implement proper oversight and accountability mechanisms with respect to officers' use of covert social media. While the accounts noted above were disabled in the winter of 2021, any newly created covert accounts must be reviewed to ensure they are not being used unlawfully to surveil and engage with Black leaders, Black organizations, or to criticize elected officials.

---

[57] Section 7-119(IV)(C) of MPD's 2021 Policy and Procedure Manual governs departmental use of social media websites as an investigatory tool. According to the policy, the following are required: (i) approval by a supervisor to create a covert account, (ii) mandated registration of covert social networking profiles with the commander of the Strategic Information Center; (iii) a prohibition of any post that promotes violence or criminal activity; and (iv) required deletion of the profile when it is no longer needed.

## MPD maintains a culture where MPD officers consistently use racist, misogynistic, and disrespectful language and are rarely held accountable

As noted above, organizational culture is created and demonstrated through consistent behavior. MPD maintains an organizational culture where officers consistently use racist, misogynistic, and otherwise disrespectful language. Furthermore, MPD does not uniformly and consistently hold officers accountable for using this language.

According to body worn camera footage, discipline records, statements from community members, and interviews with MPD officers, some MPD officers and supervisors use racial slurs. They call Black individuals "niggers" and "monkeys" and call Black women "Black bitches." One MPD supervisor referred to Somali men as "orangutans." Similarly, community members reported examples of MPD officers calling Latino individuals "beaners." MPD officers reported that their colleagues called fellow Black MPD officers "nappy head" and "cattle."

According to body worn camera footage and interviews with MPD officers and City leaders, some MPD officers and supervisors also use misogynistic language and rely on misogynistic stereotypes. This includes MPD officers calling community members, who are women, "fucking cunt," "bitch," and "cussy," a derogatory term that combines the words "cunt" and "pussy."

When investigating a sexual assault case, one MPD officer falsely stated that a man could not be guilty of sexually assaulting a woman if they had children together. MPD officers also described a dispatcher as a "bitch." Additionally, in reference to how a City leader handled a high-profile police event, an MPD supervisor told that City leader that they "hope [the leader] gets fucked in the ass."

Officers who are the subject of these racist or sexist comments hesitate to, and often simply do not, report the problematic officers because they do not believe in the efficacy of the City's and MPD's accountability systems and fear retaliation if they report the harassing behavior. As described below, the lack of confidence in MPD's accountability systems is echoed by community members as well. Review of disciplinary records demonstrates that between January 2010 and April 2021, MPD rarely disciplined officers for using racist, misogynistic, or inappropriate language.

Hennepin County prosecutors also reported that MPD officers are much less professional and respectful than officers from other police departments in Hennepin County. Since as early as 1993, MPD has had a policy requiring its officers to use professional language and conduct with community members. However, City and County prosecutors noted that it can be difficult to rely on MPD officers' body worn camera video in court because of how disrespectful and offensive MPD officers are to criminal suspects, witnesses, and bystanders. When MPD officers scream obscenities at community members, it makes it challenging for prosecutors to do their job and therefore undermines the criminal justice system.

## MPD provides deficient training and guidance for its officers, which exacerbates a pattern of discriminatory, race-based policing

Quality training is essential for creating and maintaining a non-discriminatory, effective public safety system. Police departments teach and reinforce their organizational culture to officers during training by communicating expectations. Comprehensive and quality trainings also ensure that officers can implement policies effectively. During training, officers have an opportunity to learn tactics and skills in scenario-based, tactical settings so they have some experience before they are expected to do something similar in the field for the first time. During training, trainers also can reinforce how officers should interact with community members.

Review of MPD's training materials, witness interviews, and observation of trainings demonstrates that MPD's trainings reinforce a culture that exacerbates a pattern of race-based policing. As described in detail below, MPD teaches a paramilitary culture to new officer hires and reinforces these concepts with veteran officers.

MPD offers and conducts training in a variety of settings for MPD officers, including but not limited to: Academy, in which new officer hires are trained on MPD policies and procedures; field training, in which officers who completed Academy receive on the job training; in-service training that could occur in different settings such as during annual trainings, specific subject matter trainings, tactics or skills training, or as part of a required certification; informal updates and training guidance that can occur in a variety of settings, such as during roll call; and officers and supervisors may also receive additional training related to their work or unit assignments, such as leadership and development courses.

MPD develops its own curriculum and predominately relies on internal staff to serve as trainers in these different categories. MPD leaders stated that officers are identified to serve as trainers based on their skill set. While MPD intermittently sends instructors to training sessions on defensive tactics and use of force skills, a general instructor certification is not required to serve as a trainer for Academy or in-service training. For example, MPD selected some officers to serve as defensive tactics trainers simply because they had jujitsu skills, without vetting whether the officers were in fact quality trainers. When selecting trainers, MPD does not prioritize an officer's knowledge of adult learning principles,[58]

---

[58] Contemporary theories of adult education are grounded in the particular needs and attributes of adult learners. Specifically, adults "learn new knowledge, understandings, skills, values, and attitudes most effectively when they are presented in the context of application to real life situations." Michael L. Birzer, *"The Theory of Andragogy Applied to Police Training,"* 26 POLICING: AN INT'L J. OF POLICE STRATEGIES & MGMT. 29, 33 (2003) (quoting M. Knowles, *The Adult Learner: A Neglected Species* 61 (1990)). Within the context of policing, this has necessitated a turn away "from the mechanical, militaristic and behavioral aspects" of traditional law enforcement training, and toward "training programs that inform police how to identify, respond to, and solve problems" that realistically connect with the real-world experiences of officers and the communities that they serve. *Id.* at 34.

certification showing that they possess advanced expertise relevant to the training topic, knowledge of and adherence to MPD policies, alignment with MPD's stated vision and mission, or whether the officer has a record of non-discriminatory policing. As a result, MPD's trainers provide deficient training for MPD officers.

Moreover, as demonstrated by MPD's records, problematic policing tactics are often compounded and imbedded in MPD's trainings. This is because officers who have not received proper training themselves also serve as trainers or supervisors for other officers. In addition, MPD further compounds problematic policing tactics when officers who have a history of problematic behavior are responsible for training and/or supervising new officer hires.

## MPD reinforces a culture of unquestionable compliance and aggression

Broadly, a review of MPD's Academy training and MPD's written training materials demonstrates that MPD trainings establish a warrior mindset with officers from their very first day as new MPD officer hires. The City banned official warrior style training in 2019, because "when [an officer is] conditioned to believe that every person encountered poses a threat to your existence, you simply cannot be expected to build out meaningful relationships with those same people."

> Although the City banned official warrior style training, much of MPD's current trainings continue to embed this warrior mindset.

Yet, much of MPD's current trainings continue to embed this warrior mindset. As a high-level MPD leader explained, MPD currently uses a "paramilitary" approach to train its officers. In fact, on the very first day of Academy training in 2021, an MPD leader and trainer told new hires that "instant and unquestioned compliance is in order." This mentality of "unquestioned compliance" is endemic within MPD's organizational culture. MPD carries forward this paramilitary training approach throughout MPD officers' careers.

While maintaining a chain of command is important for a police department, a mentality of unquestioning obedience undermines MPD's written policies – such as officers' duty to intervene or duty to report unauthorized use of force. Officers may be unwilling to intervene or report unauthorized force because MPD trainers instruct trainees not to question trainers or veteran officers. In fact, Internal Affairs records demonstrate that such reports are rare or non-existent. Relatedly, MPD has retaliated against and ostracized MPD officers for speaking out against racist or other discriminatory conduct within MPD.

This culture of unquestioned compliance also means that veteran officers set the tone that MPD officers take with community members – positioning community members as the enemy. In fact, community members, particularly people of color and Indigenous people, reported that this type of

culture permeates how MPD officers interact with community. Community members reported that MPD officers demand unquestioned compliance in even the most banal interactions, and this policing approach is often coupled with unprofessional, racist, or other discriminatory conduct. Training materials also reflect that MPD positions community members as oppositional to police officers – instilling an us-versus-them mentality early in officers' careers with MPD.

Observations from MPD's recent Academy training sessions in 2021 provided additional evidence of MPD's deficient training. Some trainers relied on racist tropes to impersonate Black community members as part of scenario-based training and other trainers used racist or sexist tropes. Many of the trainings also failed to incorporate an adult learning approach, which is necessary to ensure that new officer hires are properly learning MPD policies and policing skills, as well as how to properly implement them.

MPD also fails to provide comprehensive and actionable cultural competency training for officers. One high-level MPD official explained that while they asked MPD leaders to provide more robust cultural competency training for officers, training on this topic remains deficient. Currently, MPD provides minimal implicit bias or cultural competency training during Academy for new officer hires. In fact, when MPD shortened its 2021 Academy training sessions, MPD eliminated conversations about practicing cultural competency when working with specific community groups of color.[59] In a city with such racial and ethnic diversity,[60] the choice to eliminate these trainings is concerning.

## MPD officers receive insufficient in-service training

MPD does not provide its officers with appropriate, timely, or adequate in-service training on important policies and policing practices. For instance, while MPD has updated its Use of Force Policy several times since an MPD officer murdered George Floyd in 2020, MPD failed to implement and train on the updated policy in a meaningful way. Instead, MPD provided officers with a 15-minute narrated PowerPoint presentation, highlighting some of the changes made to the Use of Force Policy in and around the fall of 2020. In some precincts, supervisors also provided officers with a high-level readout of the policy changes. MPD officers reported that for over a year after the new policy was in effect, MPD provided no substantive training to officers about the new policy, which prohibited neck restraints and chokeholds.

Officers across MPD's precincts regularly expressed a lack of confidence in the policy guidance MPD provides. Officers did not understand how and why the City and MPD have made and continue to make

---

[59] The training sessions that MPD removed from the fall 2021 Academy included cultural competency sessions titled: Somali, Southeast Culture, LGBTQ, African American, Native/Indigenous, East African, Latino, and Black Men's Group.
[60] Approximately 40% of the population in Minneapolis is Black, Latino, Asian, Indigenous, or other people of color. *See* Quick Facts, Minneapolis, United States Census Bureau, 2021, available at census.gov/quickfacts/minneapoliscityminnesota (last visited Apr. 20, 2022).

changes to its policies and stated that these changes were not adequately communicated. Many officers reported MPD changes its policies frequently and that violating a policy is not a significant problem because MPD does not hold officers accountable when policies are violated. Additionally, other officers expressed concern that they did not understand the updated Use of Force Policy, but MPD leaders expected them to follow it. These concerns were also reflected by officers who explained that they do not understand how their performance is evaluated more generally. MPD leaders and supervisors do not communicate clear performance metrics to officers who are left to guess the content of those metrics.

Maintaining clear policies and providing quality in-service training to effectuate those policies is crucial for ensuring that officers have the tools and resources they need to be successful, limit racial bias, and build community trust. Training of this nature is essential, particularly when important policy changes can prevent the death of community members.

## Insufficient supervisor training reinforces a culture that is averse to oversight and accountability

MPD sergeants and lieutenants reported that the trainings MPD provides for supervisors are poor and inconsistent. Specifically, the training MPD offers supervisors lacks substantive instruction on key skills such as mentoring, coaching, and assessing officers' performance. One lieutenant explained that they believe most of the problems at MPD stem from poor and inconsistent training for supervisors. Another lieutenant noted that MPD does not offer continuing education courses for supervisors to improve their management skills. And a high-level MPD official admitted that prior to 2018, MPD offered little to no training about how to be an effective supervisor and has inconsistently offered supervisor training from 2018 onward. MPD supervisors consistently reported that they were frustrated because MPD does not provide them with the tools and resources they need to be successful.

For example, although supervisors are tasked with reviewing patrol officers' use of force reports, the percentage of use of force files that contain insufficient supervisor reviews suggest that MPD ineffectively trains supervisors on how to review force reports. In fact, based on a review of a statistically representative sample of 300 MPD use of force files from January 1, 2010, to December 31, 2020, supervisors failed to complete a thorough and sufficient review of an officer's use of force in 48.2% of cases.

This is concerning as the review also demonstrated that in 23.9% of use of force files, there is evidence in the file that contradicts or disputes the information that an officer recorded in their use of force report. The data therefore suggests that supervisors are not adequately reviewing and assessing inaccuracies or false statements made by officers in their use of force reports.

By not providing proper supervisory training, MPD leaves its supervisors without the skills and tools they need to support their staff or hold them accountable.

> **MPD leaders do not hold supervisors accountable for their inadequate review of officers' use of force.** In one case from 2017, a supervisor approved the use of force of an MPD officer who came into a bedroom to find an unarmed Black 14-year-old sitting on the floor using his phone. When the 14-year-old did not immediately stand up when instructed to do so, the officer quickly hit the 14-year-old with their flashlight, splitting his ear open, and then grabbed him by the neck and placed him in an unconscious neck restraint. By deeming this officer's use of force appropriate, the supervisor effectively authorized the officer to continue using such egregious force in the future.

The compound impact of MPD's deficient training is significant. When Academy and in-service training is insufficient, officers turn to their sergeant or lieutenant for guidance. And if that sergeant or lieutenant has no or limited training on how to be an effective supervisor, then they cannot advise officers appropriately.

## MPD's field training program furthers a pattern of race-based policing

Deficient training that furthers race-based policing also occurs in MPD's Field Training Officer program, where rookie officers who just graduated from MPD's Academy are paired with veteran field training officers for on-the-ground training. MPD field trainers have a lasting impact on rookie officers. Their role in setting the overall tone for MPD culture and accepted policing practices in Minneapolis cannot be overstated.

For example, as evidenced by body worn camera footage, in one case in 2020, a field training officer allowed the trainee to complete a search of an intoxicated Black woman, who did not have any weapons in her possession. In contrast, two hours later, the same field training officer and trainee interacted with an intoxicated white man who disclosed having a knife in his bag. The trainer instructed the trainee to forego a search, saying "I just didn't want you to waste your time."

Field training serves as the bridge from Academy training to policing in community. Field training officers can impart positive or negative policing tactics and methods. If a field training officer uses unauthorized force or otherwise exhibits police misconduct while they are training a rookie officer, then they are training that rookie officer that using unauthorized force is, in fact, acceptable and even expected. In MPD's field training program, field trainers continue to emphasize that rookie officers should demonstrate unquestionable compliance with their field trainer's orders and directions. Requiring unquestionable compliance, even when in the field, is antithetical to developing officers who are empowered decisionmakers that have a wide skill set and act according to sound policies.

Field trainers play a significant role in determining whether a rookie officer ultimately passes their probationary period because field trainers create the most written documentation of a rookie officer's on-the-job performance. The Training Unit Commander and the Deputy Chief of Professional Standards rely on field trainers' documentation when recommending whether to release an officer from probation. The Police Chief then usually accepts these recommendations.

> MPD uses officers as field trainers even after the Police Chief has sustained findings of excessive force against them.

MPD does not routinely offer any ongoing or continuing training for officers who serve as field trainers. In fact, according to its training records, MPD last offered the field training officer refresher class in 2015. In addition, MPD uses officers as field trainers even after the Police Chief has sustained findings of excessive force against them.

## MPD's emphasis on aggression during training results, in part, in officers unnecessarily escalating encounters and/or using inappropriate levels of force with community members

By teaching an approach to policing that emphasizes aggression, MPD creates a culture that results in unnecessary escalation and/or excessive force during encounters with community members of all racial backgrounds. Officers who escalate situations create circumstances, through their own actions, where it is more likely that force is necessary. Escalation tactics might include increasing exposure to a potential threat by closing the distance with an individual or abandoning positions of cover, distance, concealment, or barriers; speeding up the pace of the incident; and communicating in an aggressive manner that agitates a community member. In contrast, de-escalation refers to tactics, techniques, and strategies for successfully and safely resolving incidents with less significant, minimal, or no force.[61] De-escalation tactics may include the use of techniques such as creating distance between an officer and a community member, tactical repositioning, clear and calm communication, responding to an individual's questions, verbal persuasion, and verbal warnings.

As of at least June 2012, MPD has had a policy requiring officers to consider de-escalation and non-force options where appropriate.[62] MPD specifically defines de-escalation as taking action or

---

[61] "[T]he term de-escalation can be viewed as a both an overarching philosophy that encourages officers to constantly reassess each situation to determine what options are available to effectively respond, as well as the grouping of techniques designed to achieve this goal." *See* Int'l Ass'n of Chiefs of Police, *National Consensus Policy and Discussion Paper on Use of Force* 9 (Jul. 2020), available at www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf (last visited Apr. 20, 2022).

[62] Under the MPD's Policy and Procedure Manual, officers are required to "use de-escalation techniques and other alternatives to higher levels of force consistent with their training whenever feasible and appropriate before resorting to force and reduce the need for force." *See* MPD Policy & Procedure Manual 5-300(III)(G)(3). According to the March 2021 version of MPD's Policy and Procedure Manual, de-escalation tactics could include: requesting additional officers to the

> In 56.8% of cases, MPD officers fail to de-escalate when it would otherwise be appropriate to do so when they engage with community members of all racial backgrounds. And, in fact, MPD officers improperly escalate situations in 32.7% of cases.

communicating verbally or non-verbally to stabilize a situation so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary.

An analysis of a statistically representative sample of 300 of MPD's use of force files demonstrates that in 56.8% of cases, MPD officers fail to de-escalate when it would otherwise be appropriate to do so when they engage with community members of all racial backgrounds. And, in fact, MPD officers improperly escalate situations in 32.7% of cases. The data also reflects that MPD officers used tactics that escalated a situation in 65.4% of incidents in which officers used a neck restraint, and in 35.5% of incidents in which they used chemical irritants.

Review of body worn camera footage[63] confirms this significant statistical finding and demonstrates that MPD officers escalate situations. For example, in one case in 2016, two MPD officers unnecessarily escalated a situation after handcuffing a white man to transfer him to the hospital. The man had complied with the officers' instructions. However, one MPD officer escalated the situation by mocking the handcuffed man. As a result, the man kicked his legs in the direction of the officers. The MPD officer who mocked the man then placed his knee on the man's chest, holding him down while the other MPD officer punched the man in his cheek and jaw multiple times. The officers then placed the man face down on the pavement, while he bled profusely.[64] The MPD officers' decision to mock the handcuffed man and then beat him until he bled improperly and unnecessarily escalated this situation.

In another incident captured on body worn camera footage from 2017, an MPD officer unnecessarily escalated a situation with a Black man who was a bystander and had mocked the officer. The MPD officer immediately escalated the situation by abruptly pulling on the man's dreadlocks, which forced him to the ground. The officer then placed his full body weight on the Black man's head and neck, pinning him to the ground. While the bystander's statement was disrespectful, the MPD officer improperly escalated this situation.

---

scene, placing barriers between an uncooperative subject and an officer, attempting to isolate the subject and contain the scene, minimizing risk from a potential threat using distance, cover, or concealment. *See id.* 5-300(III)(G)(2).

[63] As noted above, because MPD officers only began wearing body worn cameras in 2016, footage from that time period is minimally available. Body worn camera footage is more regularly available from 2017 onward, when officers began more consistently activating their body worn cameras and the cameras were more widely distributed among personnel.

[64] One of the officers involved in this incident reported that although he was allegedly supposed to receive training to correct his behavior, the officer never received training and still does not understand what they did incorrectly.

MPD's insufficient training contributes to MPD officers using unnecessary and inappropriate levels of force against individuals of all racial backgrounds. Specifically, review of use of force files and body worn camera footage reveals that MPD officers resort to higher levels of physical force, sometimes before an individual is given the opportunity to respond to verbal commands, and even when the individual does not pose an imminent threat to officers or others. Specifically, a review of a statistically representative sample of 300 of MPD's use of force files from January 1, 2010, to December 31, 2020,[65] demonstrates that MPD officers used unnecessary and inappropriate levels of force in 28.6% of incidents in which they recorded using force.

Review of these files also demonstrated that in 76.5% of incidents in which MPD officers inappropriately used force, another officer should have, but failed, to intervene. In addition, in 27.9% of *all* use of force incidents, MPD officers failed to request or provide medical attention to community members who required medical attention.

For example, during an incident in 2020, an officer should have intervened while other officers inappropriately used force. During that incident, MPD officers called a Black man, who was on the ground with his hands out and obeying commands, a "fuckin' piece of shit," while one of the officers repeatedly kicked him in the face. Then, one MPD supervisor said to another officer, "Tonight it was just nice to hear we are going to go find some people. Instead of chasing people around, we are going to hunt them. You guys are out hunting people now. It's just a nice change of tempo." An MPD officer responded, "Agreed," and "Fuck these people."

MPD officers were also captured on body worn camera footage in 2020 failing to intervene and instead congratulating one another for using inappropriate force. The officers were captured saying "Gotcha" and fist bumping one another after shooting 40 mm round rubber bullets at protestors, many of whom were Black and had their hands raised in the air while yelling that they were unarmed.

Viewed cumulatively, MPD officers receive insufficient in-service training with respect to use of force, and as the record reflects, from 2010 to 2020, MPD officers unnecessarily used higher levels of force, unnecessarily escalated incidents, and failed to de-escalate when engaging with members of the public of all racial backgrounds. In sum, MPD's insufficient and sometimes non-existent policy guidance and trainings create circumstances that lead to race-based policing and therefore weaken the City's public safety system.

---

[65] The sample of cases was weighted to closely represent all of MPD's recorded use of force incidents from January 1, 2010, to December 31, 2020, in terms of the type of force used by an officer, the race of the individual against whom the officer used force, and whether the incident was coded as a crisis intervention incident involving an individual experiencing a mental or behavioral health crisis.

## MPD's insufficient training contributes to a concerning pattern with respect to how MPD officers use force against individuals experiencing mental health crises

MPD's data shows that officers are approximately twice as likely to use a neck restraint against someone experiencing a mental health crisis as opposed to someone who is not experiencing a mental health crisis. Similarly, MPD officers were almost 2.5 times as likely to use a taser against someone experiencing a mental health crisis as opposed to someone who is not experiencing a mental health crisis.

As with the analyses above, to compare how MPD officers treat individuals experiencing a mental health crisis to those who are not, MPD's use of force incidents were compared only if MPD officers recorded the same justification for the force (i.e., the individual's recorded behavior, such as whether the individual tensed) and where the same primary offense was recorded (i.e., the alleged crime or event that led to the overall police interaction, or the alleged crime that ultimately occurred).

While discrimination based on disability was not the focus of this investigation, MPD's data on this topic is troubling and needs attention. Additionally, particular attention should be placed on the intersectional experience of people of color, Indigenous individuals, and/or people with disabilities or mental health conditions. Several community members of color and Indigenous community members reported that when they or a loved one experienced a mental health crisis, the City and MPD were unable to assist them appropriately because the City and MPD lacked sufficient support and resources. Some individuals reported that they are scared to call MPD for help. Additionally, community members reported that police officers often escalated situations and did not know how to provide the support that was needed to individuals experiencing mental health crises.

## MPD's insufficient training also contributes to a concerning pattern with respect to how MPD officers engage with individuals experiencing homelessness

Many community members who experienced or continue to experience homelessness reported that when they interact with MPD officers, the officers are particularly aggressive and unnecessarily escalate situations. Individuals experiencing homelessness also reported that they allow MPD officers to search their belongings out of fear that officers would hurt them.

Individuals who offer support services for people experiencing homelessness confirmed that they have observed MPD officers being aggressive to people experiencing homelessness. In fact, these volunteers and staff members reported that they are reticent to call MPD for assistance because of how they have repeatedly observed officers interact with individuals experiencing homelessness.

In sum, MPD can and should improve its trainings to better support and guide new and veteran officers, supervisors, and field training officers to address and prevent MPD officers' unnecessary use of force and escalation tactics.

# Officers are not held accountable because of ineffective accountability and oversight systems, which contribute to a pattern of discriminatory policing

As outlined above, MPD maintains an organizational culture where:

- MPD officers use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances.
- MPD officers are more likely to stop vehicles with people of color and Indigenous individuals because of their race.
- MPD officers treat Black and white individuals differently during traffic stops because of race.
- MPD officers use covert social media to target Black leaders, Black organizations, and elected officials without a public safety objective.
- Some MPD officers and supervisors use racist, misogynistic, and disrespectful language.
- MPD officers are trained to be aggressive towards community members, escalating situations and often using inappropriate levels of force.

Yet, the City's and MPD's accountability and oversight systems are insufficient and ineffective at holding officers accountable.

## Structure

Under the current oversight structures that exist in the City, review of misconduct allegations against MPD officers and general oversight of police conduct occurs within the following entities:

1. **MPD's Internal Affairs Unit** investigates complaints from community members, City or MPD employees, and outside agencies concerning the conduct and actions of MPD employees, including use of excessive force, inappropriate language or attitude, harassment, and discrimination. Internal Affairs is organized under the Professional Standards Division of MPD and is comprised of sworn MPD sergeants who serve as investigators.

2. **The Office of Police Conduct Review (OPCR)** is a division within the Minneapolis Department of Civil Rights.[66] It is tasked with investigating complaints of police misconduct made to the City of

---

[66] Complaints alleging that a police officer violated the City's anti-discrimination ordinance can also be filed with the Complaint Investigation Division in the Minneapolis Department of Civil Rights. According to the City's records, Minneapolis Department of Civil Rights' Complaint Investigation Division has not filed or investigated any charge of discrimination based on alleged police misconduct since at least 2016. The Minneapolis Department of Civil Rights does not refer any cases to OPCR or Internal Affairs, and similarly OPCR does not refer any matters that may involve an officer violating the City's anti-discrimination ordinance to the City's Department of Civil Rights.

Minneapolis. The claims involve MPD officers who have allegedly violated MPD policy, including use of excessive force, inappropriate language or attitude, harassment, and discrimination. [67]

3. **The Police Conduct Review Panel** is a four-member panel that makes non-binding recommendations to the Police Chief about whether there is merit to support the allegations investigated by OPCR.[68]

4. **The City's Human Resources Department** investigates complaints from City or MPD personnel that an MPD officer violated City personnel policies, including allegations of discrimination, harassment, or retaliation.

5. **The City Attorney's Office** currently provides investigative support for Internal Affairs and OPCR. The City Attorney's Office also represents MPD and the City during arbitration proceedings if an appeal of a discipline decision reaches arbitration. Prosecutors in the City Attorney's Office also review MPD body worn camera footage and police reports when prosecuting misdemeanor and gross misdemeanor cases based on MPD officers' citations. In addition, the City Attorney's Office defends the City and MPD against civil lawsuits brought because of MPD officers' alleged actions.

6. **The Police Conduct Oversight Commission (PCOC)** is a body of citizens appointed by the Mayor and City Council and charged with collecting, reviewing, and auditing summary data; compiling aggregate statistics related to programs of research and study; reviewing policies and procedures; making recommendations for change; facilitating cultural awareness officer training; and performing other duties.

## OPCR is not sufficiently independent from MPD

No meaningful independent review process exists for assessing MPD officers' conduct. As described in more detail below, in practice, OPCR and Internal Affairs are not distinct. Almost every investigation of a police misconduct complaint against an MPD officer, no matter how preliminary, is assessed or guided by sworn MPD officers.

---

[67] All complaints must be filed with the OPCR within 270 days of the date of the alleged police misconduct, absent extenuating circumstances. Complaints that are over 270 days from the date of the alleged police misconduct and complaints from City civilian employees or complaints regarding Human Resources issues are directed to Internal Affairs instead of OPCR. Minneapolis, Minn. Code of Ordinances tit. 9 § 172.30(a).

[68] Regardless of whether the Panel recommends merit for any or all allegations, or the panelists disagree as to whether merit exists, all recommendations are forwarded to the Police Chief to determine whether the allegations have merit and whether any discipline will be imposed. The Panel's recommendations are non-binding, and the Police Chief may accept or reject some or all of the Panel's recommendations. Minneapolis, Minn. Code of Ordinances tit. 9 § 172.40.

From 1991 to 2012, the City chose to have a civilian review process independent from MPD in one form or another.[69] In 2012, the City created OPCR and developed this Joint Supervisor structure after a change to state law regarding the authority of civilian review boards.[70] The City implemented this Joint Supervisor structure, in part, to address concerns that the prior civilian review entity, the Civilian Review Authority, had little to no buy-in from MPD. In fact, MPD leaders and officers believed that the Civilian Review Authority was biased against officers. As a result, MPD often refused to produce files and documents to the Civilian Review Authority, even when those documents were necessary for investigating alleged police misconduct.

> No meaningful independent review process exists for assessing MPD officers' conduct.

According to former City staff and leaders, when the Civilian Review Authority existed, the Police Chiefs in office at the time often refused to impose any discipline in cases investigated by the civilian group. These hurdles prevented any meaningful civilian review and accountability from occurring. In 2012, the new Joint Supervisor system increased officers' buy-in for the investigative review process by integrating any ostensible civilian review with MPD officer review, and in accordance with a change in state law, moving the authority to make ultimate findings of misconduct solely to the Police Chief.

The pendulum, however, has swung in the opposite direction – omitting any independent review. In practice, MPD officers and/or supervisors are embedded in the review process for four of the alleged oversight entities – Internal Affairs, OPCR, the Police Conduct Review Panel, and Human Resources.

With respect to Human Resources investigations, when an MPD officer is the subject or focus of a discrimination or harassment complaint to the City's Human Resource Department, a Human Resources investigator conducts a joint investigation with a sergeant investigator from MPD's Internal Affairs.

Similarly, when a community member files a complaint with OPCR, there is no review process that is independent from MPD. Rather, the supervisor of OPCR and the MPD supervisor of Internal Affairs serve as Joint Supervisors, jointly making final decisions on whether and how to investigate complaints of police misconduct.[71] Internal Affairs is comprised of sworn MPD sergeants who serve as investigators, and OPCR is comprised of investigators who review community complaints regarding

---

[69] The immediate predecessor to OPCR was called the Civilian Review Authority and existed in different iterations from 1991 to 2012.

[70] The Civilian Review Authority ended in 2012 after the Minnesota Peace Officer's Discipline Review Act was amended to prevent civilian review boards in the State of Minnesota from making a finding of fact or determination on a complaint against a police officer. *See* Minn. Stat. § 626.89. Civilian review boards may still make non-binding recommendations on a complaint against a police officer, but the chief law enforcement officer of any government unit in the State of Minnesota retains the sole power to make findings of fact or make a final determination on these complaints. *Id.*, subd. 17.

[71] One of two Joint Supervisors – a member of MPD – takes part in the initial review of every complaint submitted to OPCR.

alleged police misconduct. In the last five years, the Joint Supervisors have disagreed on only one case of alleged police misconduct.

In addition, once OPCR completes an investigation and the Joint Supervisors come to an agreement, the file is presented to a four-member Police Conduct Review Panel that is comprised of two individuals, who are appointed by the Mayor and City Council, and two MPD supervisors, commanders, or inspectors. Thus, even at this additional stage in the police misconduct investigation process, the panel includes sworn MPD supervisors.

A high-level MPD official emphasized that while OPCR and Internal Affairs may appear to be separate entities, in actuality, they are joint entities. This MPD official explained that OPCR and Internal Affairs are "a house with two rooms." In fact, a high-level official employed by the Minneapolis Department of Civil Rights acknowledged that community members distrust the current OPCR process because the Joint Supervisor structure "poisons the well."

> OPCR and Internal Affairs are "a house with two rooms."

## The Police Conduct Oversight Commission is ineffective as implemented

The Police Conduct Oversight Commission is charged with engaging with community in discussions about policing, reviewing data related to research and closed police misconduct investigations, leading outreach and training resulting from the research and study process, and recommending policies and internal controls relating to MPD practices to City officials.

The Police Conduct Oversight Commission, which is comprised of community members who are appointed by the Mayor and City Council, lacks the appropriate resources and capacity to do its work. While the Police Conduct Oversight Commission suggests research projects, OPCR staff determine which projects to research and how to conduct that research. While the Police Conduct Oversight Commission is tasked with identifying trends and making recommendations for policy changes based on those trends, members are not given access to police misconduct investigative files, body worn camera footage, and other necessary information they need to effectively carry out those duties.

Ultimately, since the creation of the Police Conduct Oversight Commission, the City and MPD treated and continue to treat the Police Conduct Oversight Commission with similar levels of distrust and obstruction that were directed at the prior Civilian Review Authority. In fact, OPCR handpicks a small number of cases every few months to give to the Police Conduct Oversight Commission. Notably, these cases are only closed OPCR cases in which the Police Conduct Review Panel recommended finding merit, meaning that the Police Conduct Oversight Commission has been unable to review complaints that have been dismissed prior to the investigative process, effectively limiting its ability to determine whether OPCR is properly assessing police misconduct claims that are filed. Pursuant to City ordinance,

the Police Conduct Oversight Commission's recommendations are merely advisory, and the Police Chief and the City have complete discretion over whether to adopt, reject, or even consider them.

In short, the Police Conduct Oversight Commission lacks the authority and tools to make any meaningful changes within MPD. Furthermore, past and present Police Chiefs and City leaders have often dismissed and disregarded the Police Conduct Oversight Commission.

## Complaints are inadequately investigated, and officers are not consistently held accountable for misconduct

Whether a police misconduct complaint is placed with Internal Affairs, OPCR, or Human Resources, none of the existing investigative processes lead to proper investigation of and accountability for race-based policing.

First, investigators do not properly identify allegations of racially biased policing. Then, once an investigation is opened, OPCR and Internal Affairs investigators fail to properly investigate a significant percentage of police misconduct complaints by not reviewing body worn camera footage or other evidence in the file or failing to interview relevant witnesses. Next, MPD fails to consistently hold officers accountable for police misconduct, either through coaching or formal discipline. Finally, while few discipline decisions go to arbitration, if they are overturned or reduced, it is often due to preventable factors within the control of the City or MPD.

Community members of color and Indigenous individuals experience the ramifications of the failure of these accountability systems. In interviews and statements, community members of color stressed that no meaningful change results from their police misconduct complaints when they report that the mistreatment was because of their race.

## OPCR and Internal Affairs do not properly identify allegations of racially biased policing and are insufficiently trained on the topic

OPCR and Internal Affairs fail to properly identify complaints that require investigation of an officer's potential violation of MPD's Impartial Policing Policy, which prohibits bias of any kind, including racial bias. Investigators from these departments do not appropriately document complaints as racial bias complaints unless there is an allegation of direct evidence of discrimination, such as an officer using a racial epithet.

Investigators may be failing to properly identify racial bias complaints because of insufficient training. For instance, from at least 2012 to the fall of 2021, the City and MPD did not substantively train OPCR and Internal Affairs investigators to identify whether a police misconduct complaint contained an element of racial bias. OPCR investigators stated that they did not receive formal training on how to investigate allegations of discrimination. As a result, OPCR and Internal Affairs investigators generally

only identify complaints as bias complaints (or potential violations of the Impartial Policing Policy) if the complainant presents direct evidence of discrimination.

Instead, OPCR and Internal Affairs generally investigate these types of allegations under MPD's Professional Policing Policy, which requires officers to act respectfully and professionally, but says nothing about the requirement to police without discrimination or bias. Characterizing allegations of race-based policing as only allegations of unprofessionalism minimizes the severity of such allegations and overlooks that an officer's conduct could amount to unlawful discrimination. Doing so also undercuts the City's and MPD's ability to maintain a strong public safety system built on trust and respect with the public, because such a system cannot exist if it is not free from discrimination.

As of the fall of 2021, the City and MPD had not provided OPCR and Internal Affairs investigators with substantive training to identify indirect or circumstantial evidence of discrimination. In fact, OPCR investigators lacked this training even though OPCR is a division of the Minneapolis Department of Civil Rights, a department charged by city ordinance with evaluating evidence of discrimination.

### Police misconduct complaints are inadequately investigated, resulting in officers not appropriately receiving discipline for misconduct

Police misconduct complaints that originate in either Internal Affairs or OPCR are inadequately investigated. As a result, officers who have engaged in misconduct are often not appropriately disciplined.

To identify whether police misconduct complaints were adequately investigated, statistically representative samples of Internal Affairs and OPCR case files were reviewed to assess the adequacy of the investigations conducted.

To determine whether an investigation was adequate, the review included, but was not limited to, whether OPCR or Internal Affairs assessed the proper policies for potential violations, interviewed the proper individuals, whether they reviewed the proper documentary evidence, body worn camera footage, or photographic evidence, and whether the proper focus officers were identified for the investigation.

In total, the review included 125 Internal Affairs files and 164 OPCR files from January 2014 to May 2021.[72] The review of these files demonstrates that:

---

[72] The statistical sample for the OPCR and Internal Affairs files is derived from a list of Internal Affairs and OPCR files provided by the City. The files are from January 2014 through March 2021. The statistical sample includes a variety of cases such that the proportion of sampled cases in a year matches the proportion of cases in that year. The samples were sufficiently large to characterize all Internal Affairs complaints and all OPCR complaints. However, when the files or complaints are disaggregated by the race of the complainant, there is insufficient data available to make comparisons by race.

- **OPCR** improperly investigates approximately 50% of police misconduct complaints.
  - Of the cases that are inadequately investigated by OPCR, OPCR clears officers of wrongdoing in nearly 40% of those cases – where clearing an officer of wrongdoing was improper without additional investigation to determine if coaching or discipline was appropriate. An officer was considered cleared of wrongdoing if the case was dismissed entirely, closed with no discipline, or closed with an exoneration for the officer.[73]

- **Internal Affairs** improperly investigates approximately 25% of police misconduct complaints.
  - Of the cases that are inadequately investigated by Internal Affairs, Internal Affairs clears officers of wrongdoing in approximately 20% of those cases – where clearing an officer of wrongdoing was improper without additional investigation to determine if coaching or discipline was appropriate. As with the OPCR representative sample of cases, an officer was similarly considered as cleared of wrongdoing if the Internal Affairs case was dismissed entirely, closed with no discipline, or closed with an exoneration for the officer.

In many cases, Internal Affairs and OPCR investigators do not review available body worn camera footage to confirm what actually occurred, which likely contributes to high rates of improperly investigated police misconduct complaints. Additionally, inadequate assessments of witness statements may also lead to insufficient investigations. Some investigators give deference to officers who lack details or specificity in their testimony over individuals who have consistent and detailed testimony. As a high-level MPD official confirmed, when Internal Affairs investigators review cases, they are more likely to believe what a police witness says occurred, as opposed to what a community member witnessed.

Furthermore, even when OPCR, Internal Affairs, or Human Resources properly classify racial bias complaints, they often fail to properly investigate those complaints. As referenced above, investigators from OPCR, Internal Affairs, and Human Resources explained that they tend not to find that an officer engaged in racially discriminatory or harassing behavior so long as the officer did not make any explicitly racist comments.

---

[73] This does not included cases where the recorded outcome for the case was coaching.

## MPD fails to timely address policy violations, including discriminatory policing violations

The length of time it takes OPCR and/or Internal Affairs to complete an investigation and for the Police Chief to issue final discipline also contributes to an inadequate accountability system, which places community members at risk of further harm. In fact, between January 2010, and May 2021, the average time that it took OPCR and/or Internal Affairs to complete an investigation and for a Police Chief to issue a final disciplinary decision after a police misconduct complaint was filed was over 475 days, and the median time was over 420 days.

> Between January 2010, and May 2021, the average time that it took OPCR and/or Internal Affairs to complete an investigation and for a Police Chief to issue a final disciplinary decision after a police misconduct complaint was filed was over 475 days.

While capacity may be an issue for the investigative entities, once an investigation is complete, the Police Chief can further delay the investigation by failing to issue a final decision in a timely manner. In June 2020, when the Minnesota Department of Human Rights requested its court order, at least 65 completed police misconduct investigations were awaiting the Police Chief's review, and at least four of those cases had been on the Police Chief's desk for over 200 days. As of June 2020, the average time a police misconduct case sat on the Police Chief's desk without a final decision was 88 days.[74]

The delay between discipline and the underlying officer misconduct means that many officers did not receive discipline for well over a year after the police misconduct occurred. And in some cases, officers did not receive discipline for multiple years after the underlying misconduct occurred. The failure to timely address misconduct can also have a compounding impact because an officer may continue engaging in that problematic policing behavior before a final decision is reached by the Police Chief.

An officer may also continue engaging in the problematic policing behavior because their supervisor may not know the officer is even under investigation. Under MPD's current processes and systems, supervisors are not informed if one of their supervisees is under investigation or if a complaint is filed against one of their supervisees. In fact, a supervisor may be entirely unaware of a complaint's existence until they are asked to coach or until the supervisee is disciplined by a Police Chief.

Furthermore, review of police misconduct files demonstrates that before the Police Chief issues a final decision, the problematic officer may even be assigned to a field training officer position or promoted to a supervisor position, where they have the potential to train other officers to use the same racially biased methods of policing. As noted above, sometimes MPD assigns or promotes an officer to a field

---

[74] As of August 24, 2020, MPD has changed its rules and policies to align with the court order requiring the Police Chief to issue disciplinary decisions within 30 days and post final decisions on the City's website: www.minneapolismn.gov/resident-services/public-safety/police-public-safety/police-reports-and-data-requests/frequently-requested/disciplinary-decisions/. The City subsequently codified this requirement in an ordinance. *See* Minneapolis, Minn. Code of Ordinances tit. 9 § 172.70.

training officer or supervisor position even after the Police Chief issued a finding of excessive force. The adverse compound impact of these types of promotions or assignments are significant and can lead to additional unlawful, race-based policing and undermine the City's public safety system.

## MPD does not appropriately and consistently hold officers accountable for police misconduct

Even when investigations result in findings of police misconduct, MPD does not appropriately and consistently hold officers accountable for that misconduct. MPD's Policy and Procedure Manual states that if an officer violates MPD's policies, then officers may receive either coaching or formal discipline.

Coaching is not formal discipline, instead it is where a supervisor counsels a supervisee to improve specific performance.[75] Coaching is an important opportunity for MPD supervisors to connect with officers to identify and provide the resources and support that officers need.

In contrast, formal discipline includes options such as written reprimands, suspension, and termination. Only the Police Chief may issue discipline.[76] MPD's Policy and Procedure Manual and MPD's discipline matrix provide detail for disciplining misconduct for specific policy violations.

### MPD supervisors regularly do not coach MPD officers, reinforcing a culture that is averse to accountability

In 37% of OPCR cases that were referred for coaching from 2014-2018, supervisors did not coach MPD officers and no corrective action occurred.[77]

Interviews with MPD supervisors and officers and review of case files similarly shows that MPD inconsistently and sometimes inaccurately tracks whether coaching actually occurs. In several cases, MPD supervisors simply refused to coach MPD officers because they disagreed that coaching was necessary. Furthermore, MPD does not have a uniform tracking system to analyze whether coaching effectively corrects behavior or if officers continue to engage in problematic behavior after coaching occurs.

> In 37% of OPCR cases that were referred for coaching from 2014-2018, supervisors did not coach MPD officers and no corrective action occurred.

---

[75] A matter may be referred for coaching at various points in time, including but not limited to, by the Joint Supervisors before an investigation is complete, or by the Police Chief after a finding of merit.

[76] MPD patrol officers and their supervisors, including sergeants and lieutenants, are in the same bargaining unit. According to the collective bargaining agreement, only the Police Chief is permitted to issue discipline.

[77] Information reflecting MPD coaching outcomes between 2014 and 2018 is available in OPCR's 2019 Annual Report. *See* https://lims.minneapolismn.gov/Download/File/2876/Office%20of%20Police%20Conduct%20Review%202019%20Annual%20Report.pdf (last visited Apr. 20, 2022).

MPD leaders also fail to hold supervisors accountable for failing to coach their supervisees. This reinforces an organizational culture averse to accountability. As one high-level MPD official stated, "the sergeant position, first line supervisors, is the most important position out there, because you have direct contact with the officers, but yet we fail [to hold] those sergeants, first line supervisor[s], to the highest level of accountability, meaning we don't hold their feet to the fire."

By failing to coach in 37% of cases that are referred for coaching, MPD supervisors not only reinforce a culture that is averse to accountability, but supervisors also fail to create a culture of support for officers.

### MPD inconsistently and irregularly disciplines officers for misconduct, including racially biased policing

MPD inconsistently and irregularly issues officers discipline even though, as demonstrated by this investigation and detailed in these findings, incidents of police misconduct are prevalent. Although the evidence in this investigation reflects a pattern of race-based policing with respect to MPD officers' use of force, traffic stops, searches, citations, arrests, covert social media activity, and use of inappropriate language, MPD has not uniformly and consistently held officers accountable for these types of problematic behaviors.

In 2018, MPD included the Impartial Policing Policy, which prohibits racially biased policing, on MPD's discipline matrix. The discipline matrix identifies the range of discipline available for various policy violations listed on the matrix. Although an MPD Police Chief can find that an officer violated a policy, officers cannot be disciplined for policy violations that do not appear on the discipline matrix. Therefore, before 2018, officers could only be disciplined for racially biased policing if MPD determined that the officers were in violation of another policy that appeared on the discipline matrix. By adding the Impartial Policing Policy to the matrix, MPD could begin to discipline and track racially biased policing under a policy that expressly prohibits that discriminatory activity. However, the Police Chief did not discipline any officers for violations of the policy between 2018 and April 2021, based on police misconduct complaints that were investigated by OPCR.

Even in cases where MPD does discipline officers for misconduct, MPD leaders stated that MPD does not provide supervisors with important performance management records, therefore limiting the ability of supervisors to best support officers and engage in any additional progressive discipline. Performance management records, such as performance improvement plans, are only stored in the precincts in which MPD officers work. However, when officers transfer precincts, MPD does not transfer the officers' performance management records with them. As a result, many supervisors lack comprehensive information about an officer's performance history that would be critical for identifying additional support or training needs, patterns of problematic performance or behavior, or efforts to hold an officer accountable for prior misconduct.

MPD's practices in this regard have negative downstream effects that limit MPD's ability to hold officers accountable for any potential future misconduct. When subsequent supervisors do not know the extent of MPD's previous efforts to coach an officer on the same or similar problem, the prospect of implementing progressive discipline or identifying problematic patterns across MPD precincts becomes impossible.

Few discipline decisions go to arbitration and if they are overturned, it is often due to preventable factors within the control of the City or MPD

Under the collective bargaining agreement, an officer who receives formal discipline can appeal or grieve the discipline. The final stage of the grievance process is called arbitration and involves an arbitrator reviewing the record and relevant information to determine if the discipline decision should be upheld, reduced, or overturned.

Between January 2010 and April 2021, about 20 discipline decisions went to arbitration. In all but one of those cases, an arbitrator agreed with the City and MPD that some form of discipline was warranted.

> In all but one of the cases that went to arbitration, an arbitrator agreed with the City and MPD that some form of discipline was warranted.

Importantly, a review of these arbitration decisions demonstrates that when arbitrators reduce the discipline decisions made by the Police Chiefs it is often because of one or more of the following preventable factors:

- The investigation was delayed unnecessarily.

- Discipline issued by the Police Chief was more severe than prior discipline issued in similar cases, and the City failed to present evidence justifying more severe discipline.

- Statements or conduct by public officials prejudiced the investigation.

- MPD's treatment of the officer between the date of the misconduct and the date of discipline was inconsistent with the Police Chief's justification for imposing a particular type of discipline, especially termination.

The City or MPD are often able to control these factors. For instance, MPD leaders have had, and continue to have, authority to clarify or re-set expectations for officers to follow specific policies. This authority to clarify or re-set expectations, when used correctly, provides the Police Chief with flexibility to impose greater or different discipline on officers for conduct that was not disciplined or was disciplined less severely in the past. In this way, MPD is not forever tethered to discipline standards

from 10 or 20 years ago. MPD can also proactively adopt, amend, or clarify policies when gaps or policy failures are identified in existing rules.

The City and MPD also control the timeliness of police misconduct investigations to avoid undue delays between the date of the misconduct and the date of the discipline. While there may be capacity issues that impact timeliness, the City and MPD can adopt quality investigative protocols and quality review systems to ensure that when investigations occur, investigators gather all relevant documentation and interview relevant witnesses, while ensuring officers under investigation are afforded procedural fairness.

Relatedly, the City and MPD have the authority to prevent or revoke awards or special assignments for officers who are under investigation for significant misconduct, and may place them in alternative, limited duty status rather than paid administrative leave. The City and MPD must then diligently investigate to ensure that intervening employment decisions, like special assignments or promotions, do not undermine efforts to impose appropriate discipline. Doing so would reduce the number of disciplinary decisions that arbitrators overturn for those reasons.

> **One arbitration case particularly demonstrates how factors within the City and MPD's control impact arbitration outcomes.** In 2019, an arbitrator reduced a termination decision to an 80-hour suspension for an officer who had used excessive force while making an arrest in 2016. Immediately after the misconduct had occurred, MPD relieved the officer of duty and required the officer stay home before eventually assigning the officer to a desk position monitoring cameras where they had no contact with the public. However, the day after the Police Conduct Review Panel recommended finding that the officer used excessive force, MPD returned the officer to regular duty with full enforcement responsibilities and relied on the officer as a field training officer. Furthermore, while the Police Conduct Review Panel made its recommended finding to the Police Chief at the end of 2017, the officer was not provided an opportunity to contest the allegations of misconduct until eight months after the panel provided its recommendations. The Police Chief then did not terminate the officer for an additional six months.

Here, the City and MPD could have limited the likelihood that an arbitrator would have reduced this disciplinary decision by diligently investigating the case, not returning the officer to regular duty, and not permitting the officer to serve as a field training officer. In addition, the City and MPD could have diligently moved forward so that the Police Chief could have issued formal discipline and terminated the officer soon after the panel recommended finding merit on the excessive force allegation, rather than waiting over a year to do so. Because of the actions and inactions of the City and MPD, an officer

who engaged in a serious excessive force violation was returned to their job to police in the community and train new MPD officers.

Disciplinary decisions may also be reduced or altered before they reach the arbitration stage in the grievance process. City and MPD leaders may choose to settle a disciplinary dispute or reduce discipline before a grievance reaches arbitration for a number of reasons, such as how they allocate resources.

City and MPD leaders may also choose to settle a disciplinary dispute or reduce discipline before a grievance reaches the arbitration process because they may believe that the arbitrator will rule against the City. As noted above, however, in all but one of the approximately 20 cases arbitrated in over 10 years, the arbitrator agreed with the City and MPD that some form of discipline was warranted.

In sum, the actions and inactions taken by the City and MPD are the principal obstacles to holding officers accountable, not arbitration decisions.

## MPD's failure to collect and analyze robust policing data impairs the organization from holding officers accountable and providing them with necessary support

Recording, analyzing, and acting on quality data is critical for MPD to make data-driven decisions that are shaped by public safety needs and are free from discrimination. While MPD collects some important data points, MPD does not sufficiently use the data it collects. For instance, MPD does not use its data to identify patterns that would enable MPD to provide better training for and supervision of officers, to provide officers with needed support, or to address and correct discriminatory policing practices that undermine public trust and erode public safety.

### MPD fails to sufficiently collect and analyze policing data, resulting in a lack of accountability for race-based policing

MPD currently tracks some important data points that it could use to identify whether race-based disparities exist in officers' policing activities. However, MPD leaders admit they do not analyze policing data to identify and address these disparities. For example, MPD can analyze policing data it currently collects to determine which officers, compared to their peers, have a greater propensity to use a higher level of force against people of color, Indigenous individuals, and/or individuals experiencing a mental or behavioral health crisis. MPD can also analyze its data to identify individual officers who engage in excessive force compared to their peers at MPD. However, as of January 2022, MPD has chosen not to analyze its data in this way. By doing so, MPD would have a comprehensive view of how its officers are using force against community members of color, Indigenous individuals, and community members with disabilities. As a result, City and MPD leaders cannot provide sufficient support, oversight, and accountability to address the race-based disparities in MPD officers' use of force, stops, searches, arrests, and citations, as discussed in detail above.

Furthermore, MPD can improve its ability to analyze data by consistently and properly recording data that officers are already required to record. City and MPD leaders have known that MPD officers often fail to properly record data since at least 2015, when the City released a report indicating that MPD officers were not consistently reporting traffic and pedestrian stops and searches they conducted.[78] Analysis of records and witness interviews further demonstrates that MPD officers continue to fail to properly record their policing data. This is especially true when it comes to recording the race of individuals with whom they interact. With more consistent and accurate reporting, MPD would be able to better understand, identify, and address trends in its policing data, especially patterns of race-based policing.

MPD can also improve its ability to analyze policing data by creating integrated systems to connect datasets to simplify analysis and identify meaningful trends. For instance, MPD's current data systems do not automatically connect a supervisor's review of an officer's use of force to a related police misconduct file, which contains an investigation of that officer's alleged use of excessive force. Connecting these two data systems would enable MPD leaders to easily identify supervisors who rubber stamp problematic use of force reports or individual officers who have concerning use of force patterns.

### MPD effectively does not have an Early Intervention System (EIS) to support officers with the mental toll of policing or to hold officers accountable

Since 2009, MPD has ostensibly worked to develop and implement an Early Intervention System (EIS) to analyze data and provide supervisors with information to support MPD officers. An Early Intervention System is a data driven, electronic management tool that police departments use to identify officers who may have performance problems or may be mentally unwell based on various data points.[79] If used correctly, an Early Intervention System could be used for both intervention and prevention – to both forecast risks of certain officers and mitigate those risks.

On the intervention side, for instance, an Early Intervention System could be used to provide mental health support for officers who appear to be struggling as evidenced by a pattern of calling in to work sick or failing to appear for their shifts. On the prevention side, an Early Intervention System could be used to identify officers who are at risk of using excessive force against community members based on their use of force record. An Early Intervention System could also be used to identify any patterns of race-based policing, enabling supervisors to proactively provide the necessary support needed for

---

[78] City of Minneapolis, Police Conduct Oversight Commission, Investigatory Stop Documentation Review, 13 (April 17, 2015) available at www2.minneapolismn.gov/media/content-assets/www2-documents/departments/Investigative-Stops-Study-(PDF).pdf (last visited Apr. 20, 2022).

[79] Early Intervention Systems can track things such as complaints against officers, use of force reports, use of sick leave, traffic stops, arrests, and even track for potential concerns around race-based policing. Police departments can set different threshold levels with Early Intervention Systems to reflect organizational standards so that supervisors are notified when an officer surpasses a threshold.

those officers. It could also identify employees or unit/precinct concerns at the earliest possible stage so that intervention and support can be offered to improve performance and behaviors.[80]

Ideally, a well-functioning Early Intervention System prevents the need for disciplinary action and promotes officer safety, job satisfaction, and wellness.

> Dozens of MPD officers described the mental toll of policing and repeatedly expressed a desire for City and MPD leaders to offer additional mental health and wellness support.

Dozens of MPD officers described the mental toll of policing and repeatedly expressed a desire for City and MPD leaders to offer additional mental health and wellness support. Many officers explained that they do not feel supported by MPD and City leaders.

For example, one officer reported feeling abandoned by MPD leaders and helpless after the officer was involved in a use of force incident involving a Black man. The officer reported that because of the incident they are "paranoid" around Black men and have "great anxiety" when they see Black men "holding objects in their hands or acting suspicious." The officer feared they "may react too quickly in confrontations" with Black men, and specifically noted that their "[h]yper vigilance . . . makes [them] worry [they] will shoot too fast if startled by young Black males." The officer explicitly noted that they "don't feel this way with other races." If MPD had an effective Early Intervention System or mental health and wellness program with robust support, interventions, and training for officers, MPD could have helped this officer before they reached this level of self-described paranoia about Black men.

MPD claims they invested resources in developing an Early Intervention System over the past decade, including visiting other jurisdictions to observe their Early Intervention Systems and assigning staff to analyze data points. However, MPD's Early Intervention System is, in practice, non-existent.

Currently, MPD does not collect or consider all relevant data points needed to individually assess whether an officer requires intervention or support. A high-level MPD official described the system that MPD uses as "an officer putting together a spreadsheet." One MPD sergeant stated that they were not aware that MPD was even "still utilizing" an Early Intervention System. And a high-level MPD official explained that MPD's Early Intervention System is "basically a band aid," because MPD does not have the resources it needs to make it effective. And yet another high-ranking MPD official described MPD's Early Intervention System as "a unicorn," indicating that it was imaginary.

In 2013, the U.S. Department of Justice's Office of Justice Programs conducted an independent review of MPD's Early Intervention System. Their report, released in 2014, identified multiple areas for MPD

---

[80] Interventions to improve officer performance could include counseling by supervisors, mental health support from licensed practitioners, and retraining on areas of police conduct where a problem may exist.

to improve its system. Since then, MPD "re-launched" its Early Intervention System at least twice. Yet, as an institution, MPD fails to place the needed resources and effort into an Early Intervention System or any other data management system. MPD leaders and supervisors state that because of insufficient resources, MPD has not consistently tracked officer conduct to determine whether intervention is needed. Without placing the necessary resources into an Early Intervention System, MPD cannot strategically analyze its policing data to ensure decisions are made to increase public safety, support officers, and protect and serve community members.

Importantly, there is a lack of buy-in from officers to collect robust data for any system – Early Intervention System or otherwise – especially with regards to collecting race data on individuals who interact with officers. This lack of buy-in is, in part, a result of supervisors who do not hold their subordinates responsible for reporting and recordkeeping. Multiple officers also reported that they worry an Early Intervention System could be used against them to discipline them for policing activities, rather than identify opportunities for additional training and support.

The failure of the City and MPD to create and utilize a robust data tracking tool means the current data structures in place allow for a pattern or practice of race discrimination to persist. As recently as October 2021, the City again pledged to implement a robust Early Intervention System. While the City continues to express commitment to develop an Early Intervention System, any robust data analysis program will fail to be effective without a cultural change around the importance of appropriately capturing data as required by policy and accountability for failing to do so.

> The failure of the City and MPD to create and utilize a robust data tracking tool means the current data structures in place allow for a pattern or practice of race discrimination to persist.

In sum, the City's and MPD's accountability and oversight systems are failing to appropriately hold officers accountable and are contributing to discriminatory outcomes.

## The City fails to provide individuals of all racial backgrounds accused of crimes with evidence relevant to their defense, and this failure disproportionately affects Black individuals who are arrested and charged at higher rates

The City's current system for identifying and producing information that could be used to impeach MPD officers' credibility exacerbates a pattern or practice of discriminatory, race-based policing. This is because people of color, and particularly Black community members, as noted above, are arrested and charged at higher rates than white people in similar circumstances. Therefore, people of color may disproportionately suffer from being denied impeachment information about MPD officers that is relevant to their defense.

During a criminal prosecution, federal and state law requires prosecutors to provide individuals accused of a crime with specific information. For instance, prosecutors must provide defendants with *Brady* information – information that could refute or disprove a defendant's guilt.[81] Prosecutors must also provide defendants with *Giglio* information[82] – information that could impeach, or call into a question, a witness's credibility, including a police officer's credibility.[83]

Information about a police officer's credibility is important because it could be helpful for a jury and/or a judge to decide the strength of a case against an individual who is accused of a crime. Examples of this type of material include evidence that an officer made a false report or falsified official records, discriminated against an individual because of their race, mishandled evidence, was found by a court to not be credible or truthful, or was convicted of a crime.

In Minneapolis, City staff are charged with identifying and collecting this type of impeachment information about MPD officers who were involved in completing the police work that underlies misdemeanor, gross misdemeanor, and felony criminal cases. City staff must provide this information to prosecutors from the City Attorney's Office, who prosecute misdemeanor and gross misdemeanor crimes that arise from MPD's police work, and to prosecutors from the Hennepin County Attorney's Office, who prosecute felony-level crimes that arise from MPD's police work. City and Hennepin County

---

[81] The term *Brady* evidence refers to the United States Supreme Court case *Brady v. Maryland,* 373 U.S. 83 (1963).

[82] The term *Giglio* evidence refers to the United States Supreme Court case *Giglio v. United States,* 405 U.S. 150 (1976). City and County prosecutors may also have to produce such data under Minnesota Rule of Criminal Procedure 9.

[83] The City uses the term "*Brady* data" to refer to information that could be *Brady* and/or *Giglio* data. There are generally two types of impeachment records: 1) public records, which include data reflecting sustained findings of misconduct; and 2) non-public records, which may include pending or ongoing investigations into alleged misconduct or completed investigations that did not result in sustained findings but nevertheless may affect an officer's credibility as a witness. In Minnesota, when an individual charged with a crime seeks *Brady* data that is non-public, the City must ask a court to independently review the material to determine whether it is relevant to the charges or defenses or credibility of a witness in the case and if so, issue an order permitting the City to share the data under relevant state law provisions, such as the Minnesota Government Data Practices Act.

prosecutors are then obligated to disclose the impeachment evidence to individuals accused of a crime.

## The City fails to comprehensively produce impeachment information to individuals of all racial backgrounds charged with crimes

As of December 2021, the City's process for finding and producing impeachment information about MPD officers was based on procedures established in 2017. In the words of one prosecutor, the process in place before 2017 was "woefully lacking" because the City had not been uniformly tracking or producing this information.

However, even under the updated process, the City often still fails to produce impeachment information appropriately. Of particular concern is the fact that the City failed to provide County prosecutors with any updated impeachment information about MPD officers from the beginning of 2020 through at least the fall of 2021.[84] The City and County are aware that the City has not provided this information to Hennepin County for this time period. Therefore, both the City and County are aware that individuals charged with the most serious crimes may have been denied access to this information even if it is relevant to their cases.

The systemic failure to produce comprehensive impeachment information may exist for several reasons. First and foremost, City and County prosecutors may be providing defendants with incomplete impeachment information about police officers because the City's system of identifying this information depends entirely on the accuracy and completeness of investigations conducted by Internal Affairs and the Office of Police Conduct Review (OPCR). As explained in more detail above, Internal Affairs and OPCR do not effectively or sufficiently identify and investigate police misconduct complaints. Therefore, because the City's disclosure of impeachment evidence relies on Internal Affairs and OPCR to accurately, thoroughly, and timely investigating police misconduct, the current system does not and cannot aggregate all incidents and information that could otherwise impact an officer's credibility or be relevant to an individual's defense to criminal prosecution.

Additionally, City and County prosecutors may be providing defendants with incomplete impeachment information about police officers. Instead of promptly adding relevant information into officers' files when there is a finding of misconduct, the City collects this information only four times a year. As a result, individuals accused of crimes may consider plea deals or may even proceed to trial without the benefit of impeachment evidence, simply because the City infrequently updates its records.

---

[84] Because the Hennepin County Attorney's Office is a separate legal entity from the City of Minneapolis, unlike the City Attorney's Office, the Hennepin County Attorney's Office does not have direct access to new records in live-time that could be relevant for challenging the credibility of MPD officers. Rather, the Hennepin County Attorney's Office must affirmatively request or rely on the City to produce any new records, which Hennepin County does not yet have in its possession.

Moreover, as of fall 2021, the City only treated matters of police misconduct that resulted in discipline as impeachment information that warranted disclosure to an individual accused of a crime. Under the State's data privacy law, sustained misconduct findings that do not result in discipline are not public data. State law further provides that a person accused of a crime can only have access to sustained misconduct findings that did *not* result in discipline if that information is relevant – and relevance is determined by a prosecutor and a judge. Moreover, no written guidance exists on determining what information is relevant and this decision process appears to depend entirely on the discretion of the prosecuting attorney.

As noted above, a recommendation for coaching is one of the most frequent outcomes for a sustained finding of misconduct by an MPD officer, and because coaching is not considered discipline, a sustained misconduct finding that only results in coaching is *not* public. As a result, many cases of sustained misconduct where coaching is recommended may not be disclosed to people facing criminal prosecution solely because a prosecutor does not deem that information to be "relevant."

Public defenders and County prosecutors stressed that inappropriately narrowing impeachment information in this manner means that neither prosecutors nor public defenders have the information they need to properly prosecute or defend a case.

Furthermore, in preparation for criminal trials, prosecutors will also sometimes choose to simply remove a police officer from a witness list instead of producing impeachment evidence related to that officer. This means that even if a case proceeds to trial, an individual accused of a crime may be denied impeachment evidence about an officer who had a role in their arrest because a prosecutor simply removed that officer from the witness list.[85]

## MPD leaders fail to use information about officers' lack of credibility to discipline officers

Prosecutors are aware of problematic MPD officers because these attorneys regularly review police records and view body worn camera footage to prosecute criminal cases. Prosecutors' review of this material provides them insight into which MPD officers routinely engage in improper conduct, such as when an officer provides a written report or testimony that is dramatically different from what is captured on body worn camera footage, or when an officer uses excessive force on a community member.

Although prosecutors are aware of this troubling information, there is no formal policy or system in place to alert MPD leaders when prosecutors determine that an MPD officer might have credibility

---

[85] In addition, individuals accused of crimes may never even receive relevant impeachment evidence because prosecutors disclose any such evidence on the eve of trial. While this is standard practice across prosecutors' offices in Minnesota, this practice results in individuals pleading guilty without knowing whether relevant impeachment evidence even exists.

issues or other concerning performance problems. And while there are occasions when prosecutors report concerns to their supervisors or MPD leaders, MPD leaders do not sufficiently act upon this information. As one prosecutor explained, there is a "general feeling of hopelessness over nothing happening," after issues of officer misconduct are raised by prosecutors.

> There is no formal policy or system in place to alert MPD leaders when prosecutors determine that an MPD officer might have credibility issues or other concerning performance problems.

Concerningly, one high-level MPD leader stated that they do not want to know which officers who prosecutors determined are not credible because of the officers' history of dishonesty. The MPD leader further stated that he does not believe that information about an officer's "credibility [and] integrity" is relevant for performance management. This admission from an MPD leader was in alignment with prosecutors' concerns regarding accountability within MPD. An officer who is not credible in court and has a history of dishonesty undermines public safety and creates distrust across the board – with prosecutors, the courts, and the public.

While the City Attorney's Office discussed its desire to update its processes for maintaining and producing impeachment evidence, without substantial changes, problematic officers will continue to police the streets of Minneapolis, detaining, searching, and arresting people even though prosecutors have determined that these officers are not credible because they have a history of dishonesty.

The City's current system exacerbates a pattern or practice of discriminatory, race-based policing because people of color, and particularly Black community members, are arrested and charged at higher rates than white people in similar circumstances. Therefore, they disproportionately suffer when the City fails to provide impeachment information about MPD officers that is relevant to their defense.

## Without coordinated and sustained action from City and MPD leaders, MPD's organizational culture will continue to undercut the efficacy of the City's public safety system and perpetuate race-based policing

While current and former City and MPD leaders have made and continue to make efforts to implement substantive change to address race-based policing, leaders have not collectively acted with the necessary urgency, coordination, and intentionality required to create and maintain a non-discriminatory, strong public safety system.

As a result of a lack of coordinated and sustained action to address racial disparities in policing, leaders have allowed MPD to maintain an organizational culture that demands unquestionable compliance, emboldens aggressive escalation, and is averse to accountability.

### City and MPD leaders acknowledge that MPD engaged and continues to engage in race-based policing and leaders have made some efforts to address racial disparities

Former and current Mayors, City officials, Police Chiefs, and high-level MPD officials acknowledge that there is a problem with MPD's organizational culture that results in racial disparities. For example, one of these leaders acknowledged that MPD has an internal culture that is "steeped in racism." Another leader noted that it is unsurprising that "most excessive force complaints about MPD officers come from people of color and Indigenous people in Minneapolis." One of the leaders also explained that some MPD officers believe that "Black people are ruining this [City]."

> One of these leaders acknowledged that MPD has an internal culture "steeped in racism."

To address these known disparities, City and MPD leaders have made efforts over the past several years to implement changes. For instance, in or around 2008, the City launched a juvenile diversion program aimed at decreasing the number of youth of color who enter the criminal justice system. In 2013, after MPD officers killed Terrence Franklin, MPD began referring officer-involved shooting cases to an external state entity for an independent and external investigation into whether any state laws were violated.[86] In 2016, the City and MPD began providing body worn cameras to MPD officers in an effort to increase transparency and accountability. By 2017, MPD began recording the race of

---

[86] When reviewing an MPD officer-involved shooting, the Bureau of Criminal Apprehension, a division of the Minnesota Department of Public Safety, investigates whether state law was violated. The Bureau of Criminal Apprehension does not investigate whether any MPD policies were violated.

individuals involved in traffic stops more consistently. In 2019, the City prohibited MPD officers from participating in warrior style training.

## A lack of collective action has allowed a problematic organizational culture to fester in MPD

Current and former City and MPD leaders stated that they could not or cannot make necessary changes to the police department to address race-based policing because they were thwarted by legal or practical limitations imposed under collective bargaining agreements, the arbitration system, or the City Council's funding decisions. Specifically, current and former Mayors and high-level City leaders claimed they did not have the necessary authority or political will and support to manage the police department. However, the Mayor has held this power for decades. Additionally, the City Council plays a crucial role by approving the City's budget, including the budget for the police department.

Current and former City leaders also stressed that without arbitration reform or other changes to state law, the City's hands are tied when it comes to accountability and oversight in the police department. However, as laid out in detail above, MPD's own structures and systems are the primary obstacles to creating an organizational culture of accountability and oversight in the police department. Even within the contours of existing state law, City and MPD leaders can immediately make substantive changes.

In some cases where City and MPD leaders have attempted to implement change, those attempts were eroded by City and MPD leaders providing inaccurate or misleading information to the public. For instance, as of December 2020, community members believed that MPD had eliminated their practice of requesting no-knock warrants, in part, because City and MPD leaders held a press conference in November 2020, announcing a "new, no-knock warrant policy." Despite what some leaders may have understood about the policy change and despite how the policy change was communicated to the public, MPD had not banned no-knock warrants. Rather, MPD's updated no-knock warrant policy simply memorialized what the SWAT team had already been permitted to do for years, which was to perform no-knock warrants.

> City and MPD leaders providing inaccurate information sows community distrust, creates confusion, and undermines meaningful attempts of change.

On February 2, 2022, MPD officers shot and killed Amir Locke, a young Black man, while they were executing a no-knock warrant in Minneapolis. In a subsequent press release, MPD repeatedly referred to Mr. Locke, who was not a suspect, as a suspect, and released pictures to further paint Mr. Locke as a suspect. City and MPD leaders providing this type of inaccurate information sows community distrust, creates confusion, and undermines meaningful attempts of change. Communicating honestly with the public, especially in times of crisis, is an important part of building trust, addressing racial disparities, and strengthening the City's public safety system.

While there have been some efforts by current and former City and MPD leaders to implement change, City leaders have not collectively acted with the necessary urgency, coordination, and intentionality that is required to create and maintain a strong public safety system, eliminate discriminatory policing, and maintain an organizational culture that welcomes accountability and oversight.

City and MPD leaders have been aware of deep organizational culture problems within the MPD resulting in the long-standing, disproportionate impact of race-based policing on people of color and Indigenous individuals. In the vacuum of collective action from key City and MPD leaders, the organizational culture at MPD has existed unchecked.

# Conclusion, recommendations, and next steps

For the reasons set forth above, the Minnesota Department of Human Rights finds there is probable cause that the City of Minneapolis and the Minneapolis Police Department engage in a pattern or practice of race discrimination, in violation of the Minnesota Human Rights Act.[87]

MPD's data demonstrates significant racial disparities with respect to officers' use of force, traffic stops, searches, citations, and arrests. MPD officers used covert social media to surveil Black individuals and Black organizations, unrelated to criminal activity, and maintain an organizational culture where some officers and supervisors use racist, misogynistic, and disrespectful language with impunity. This pattern or practice of race-based policing is caused by MPD's ineffective oversight and accountability structures and ineffective trainings that reinforce a culture that is averse to accountability and not supportive for officers. Additionally, City and MPD leaders have failed to act collectively with the urgency, coordination, and intentionally necessary to address well-known racial disparities.

Race-based policing is unlawful and especially harms people of color and Indigenous individuals– sometimes costing community members their lives.

**Moving forward, the Minnesota Department of Human Rights will work with the City of Minneapolis to develop a consent decree**, which is a court-enforceable agreement that identifies specific changes to be made and timelines for those changes to occur. Unlike previous efforts to reform policing in Minneapolis, a consent decree is a court order issued by a judge. Importantly, a consent decree also integrates independent oversight in the form of a monitor or monitoring team that regularly reports to the court to hold the parties accountable to the agreed upon changes. As part of this process, MDHR will meet with community members, MPD officers, City staff, and other stakeholders to gather feedback on what should be included in a consent decree to address racial discrimination in policing in Minneapolis.

However, City and MPD leaders do not need to wait for a finalized consent decree to institute immediate changes to begin to address the causes of discrimination that weaken the City's public safety system and harm community members. Below are three immediate, next steps that could ultimately be included in the consent decree and that the City could move forward with now to begin to address race-based policing and improve public safety.

**First, the City and MPD must make several immediate changes to improve police accountability and oversight.** While the current oversight structures in place are insufficient, there are steps the City and MPD can take now. MPD leaders can re-set clear policy and performance expectations. They can then

---

[87] Minn. Stat. § 363A.12, subd. 1.

hold officers uniformly accountable for following those expectations. City and MPD leaders should complete timely, comprehensive, and non-biased investigations of alleged police misconduct. Supervisors can similarly move forward by immediately coaching officers in need of performance management, offering necessary support, and actively engaging in progressive discipline, if needed. Importantly, City and MPD leaders can also analyze MPD's policing data to identify, track, and seek to correct race-based policing and other concerning patterns. All of these changes collectively, with strong organizational leadership, will result in improved accountability and oversight. These changes are within the control of the City and MPD and do not require modifications to the collective bargaining agreement, city ordinance, or state law.

**Second, MPD must move quickly to improve the quality of its trainings.** At its root, policing is a public service. Trainings for new officer hires and veteran officers, therefore, should significantly shift in tone from a paramilitary approach to a public service approach. Trainings should be timely when policy changes are made to ensure that officers have the support and resources they need to succeed. Supervisors should be provided with more robust supervisory training so that they are able to better support officers and hold them accountable. MPD can also select field training officers who support an organizational culture that is focused on respect and professionalism and encourage new officer hires to develop and hone critical decision-making skills in order to build a stronger public safety system.

**Third, City and MPD leaders must communicate honestly with members of the public.** Especially when critical incidents arise, such as officer-involved shootings, City and MPD leaders should provide timely and accurate information to community members to avoid escalating confusion and increasing community distrust.

As these findings highlight, changes and reforms to MPD's policies and procedures alone will not be sufficient. With collective action, urgency, coordination, and intentionality, the City of Minneapolis can address racial disparities in policing to improve public safety and increase community trust.

**Minnesota Department of Human Rights**

**FOR THE DEPARTMENT BY:**

Dated:  **April 27, 2022**

Rebecca Lucero, Commissioner